**UNITED STATES of America,**
**Plaintiff-Appellant,**

v.

**Tom WILSON and Sonny Erickson,**
**Defendants-Appellees.**

**UNITED STATES of America,**
**Plaintiff-Appellant,**

v.

**Gig and Jeanette EBERHARDT,**
**Defendants-Appellees.**

Nos. CR–84–0396 EFL,
CR–84–0395 EFL.

United States District Court,
N.D. California.

June 19, 1985.

William Farmer, Asst. U.S. Atty., San Francisco, Cal., for plaintiff-appellant.

Geoffrey A. Hansen, Asst. Fed. Public Defender, Lawrence Lichter, Serra, Perelson & Metcalf, San Francisco, Cal., for defendants-appellees.

## MEMORANDUM OPINION

LYNCH, District Judge.

Tom Wilson and Jeanette Eberhardt were charged by information with the unlawful sale of anadromous fish caught within the Hoopa Valley Indian Reservation.[1] Both defendants were charged under 16 U.S.C. § 3372(a)(1), the Lacey Act, which makes it unlawful for any person to sell any fish taken in violation of any regulation of the United States. Specifically, the defendants were accused of violating 25 C.F.R. §§ 258.8(d), (e) prohibiting commercial fishing by Indians on that part of the Klamath River that flows through the Hoopa Valley Reservation.[2]

Both defendants agreed to have their cases heard by a magistrate. Magistrate Steele F. Langford, recognizing that these cases involved common questions of law and fact, agreed to consolidate the proceedings. On September 14, 1984, defendants Wilson and Eberhardt moved to have the informations filed against them dismissed. The defendants argued that the regulations prohibiting commercial fishing on the Hoopa Valley Reservation, which underlie their prosecutions under the Lacey Act, were invalid. Defendants' motions were heard on November 9, 1984. On March 5, 1985, Magistrate Langford granted Wilson's and Eberhardt's motions to dismiss. The next day, the Government filed a notice of appeal to this Court.

### I. Background Facts

Both Wilson and Eberhardt are members of the Yurok Indian Tribe. Along with the Hoopa Indians, the Yuroks occupy the Hoopa Valley Reservation in California's Del Norte and Humboldt counties. Geographically, the reservation consists of three parcels: (1) the Old Klamath River Reservation, one mile in width on each side of the Klamath River, extending from the river's mouth on the Pacific Ocean up the river for 20 miles; (2) the original Hoopa Valley Reservation, a 12–mile square, centered at the confluence of the Klamath and Trinity rivers; and (3) a 30-mile strip along the Klamath River connecting the Hoopa and Klamath parcels. *See Mattz v. Arnett*, 412 U.S. 481, 493, 93 S.Ct. 2245, 2252, 37 L.Ed.2d 92 (1973); *Arnett v. 5 Gill Nets*, 48 Cal.App.3d 454, 458, 121 Cal.Rptr. 906 (1975), *cert. denied*, 425 U.S. 907, 96 S.Ct. 1500, 47 L.Ed.2d 757 (1976).

The Department of Interior ("Interior") has promulgated regulations regarding the

---

**1.** Anadromous fish are hatched in freshwater, grow to maturity in the ocean, and usually return to their freshwater parent streams to spawn. The important anadromous fish found in the Klamath and Trinity river drainage basin are chinook and coho salmon, steelhead, coastal cutthroat and brown trout, green and white sturgeon, American shad, Pacific lamprey and candlefish. Bureau of Indian Affairs, *Environ-*

*mental Impact Statement, Indian Fishing Regulations* 9 (1985).

**2.** During July 1982, undercover agents of the United States Fish and Wildlife Service met the defendants. The agents allege that on several occasions Wilson and Eberhardt sold them anadromous fish within the boundaries of the Hoopa Valley Indian Reservation.

commercial taking of anadromous fish by Indians on the Hoopa Valley Reservation. *People v. McCovey*, 36 Cal.3d 517, 529–31, 205 Cal.Rptr. 643, 685 P.2d 687 (1984). In 1977, Interior expressly limited commercial fishing by Indians to five fish per day. 42 Fed.Reg. 40,904–40,905 (August 12, 1977). In 1978, Interior imposed interim regulations that allowed eligible fishermen to fish commercially on the Klamath River only during limited seasons. 43 Fed.Reg. 30,048 (July 13, 1978). Interior then superceded these rules by another set of regulations in 1979. 44 Fed.Reg. 17,144–17,151 (March 20, 1979) (codified in 25 C.F.R. 258).[3]

It was in 1979 that Interior prohibited all commercial fishing and sale of anadromous fish caught on the Hoopa Valley Reservation. 25 C.F.R. § 258.8(c), (d). These regulations define commercial fishing as the taking of fish or fish parts with the intent to sell or trade them or profit economically from them. 25 C.F.R. § 258.4(b). The 1979 prohibition has remained in effect for over six years, having been renewed in successive versions of the regulations. *McCovey*, 36 Cal.3d at 529, 205 Cal.Rptr. 643, 685 P.2d 687.

The defendants argued before the Magistrate that Interior's prohibition on commercial fishing constituted a "modification or abrogation" of their treaty right to take Klamath River fish. The defendants contended that absent express Congressional authority this right could not be abridged by an executive agency. *United States v. Fryberg*, 622 F.2d 1010, 1013 (9th Cir.), *cert. denied*, 449 U.S. 1004, 101 S.Ct. 545, 66 L.Ed.2d 301 (1980). Since the fishing regulations at issue in the Wilson and Eberhardt prosecutions were not expressly authorized by Congress, the defendants concluded, they were invalid. Alternatively, the defendants argued that, even if authorized, Interior's moratorium on Klamath River fishing was impermissible because it discriminated against Indians by placing

the greatest burden of resource conservation upon tribal fishermen.

In his March 5, 1985 order, Magistrate Langford granted the defendants' motions to dismiss. First, contrary to the position advocated in the amicus brief submitted by the Court of Indian Offenses, the Magistrate ruled that the district court had concurrent jurisdiction to hear and determine the defendants' motions. Second, the Magistrate held that Interior was without authority to promulgate regulations that abrogated the tribe's federally reserved right to take fish from the Klamath River. Third, the Magistrate held that even if Interior were authorized to promulgate these fishing regulations, as written they were arbitrary, not necessary to achieve a conservation purpose and impermissibly discriminatory. Concluding that the regulations underlying the Lacey Act prosecution were invalid, the Magistrate dismissed the informations against the defendants.

The Government appeals this decision. As the Magistrate's conclusions constitute findings of law, they are subject to this Court's *de novo* review on appeal. *U.S. v. Nance*, 666 F.2d 353, 356 (9th Cir.1982). There are, therefore, three distinct issues before this Court: proper jurisdiction, abrogation, and discrimination.

## II. *Jurisdiction*

Appellee Eberhardt argues on appeal that Congress did not intend the Lacey Act to be used to prosecute Indians in federal court. Instead, she contends, the Court of Indian Offenses of the Hoopa Valley Reservation has the exclusive jurisdiction to try eligible Indians accused of violating Interior's regulations. The Magistrate rejected this jurisdictional argument. He ruled instead that the Lacey Act conferred concurrent jurisdiction on federal and tribal courts to prosecute Indian fishing offenses. The Court agrees.

The Lacey Act provides no independent basis for criminal prosecution but rather

---

**3.** These regulations were operative at the time appellees committed the offenses. The regulations currently in effect are substantially similar to those promulgated in 1979. *McCovey*, 36 Cal.3d at 529 n. 12, 205 Cal.Rptr. 643, 685 P.2d 687.

makes a violation of an underlying law or regulation a trigger to federal liability.[4] Section 3372(a) makes it unlawful for any person:

> (1) to import, export, transport, sell, receive, acquire, or purchase any fish or wildlife or plant taken or possessed in violation of any law, treaty, or regulation of the United States or in violation of any Indian tribal law;
>
> (2) to import, export, transport, sell, receive, acquire, or purchase in interstate or foreign commerce—
>
> (A) any fish or wildlife taken, possessed, transported, or sold in violation of any law or regulation of any State or in violation of any foreign law, ...

16 U.S.C. § 3372(a).

As expressly stated in the Lacey Act, federal courts have jurisdiction over any actions arising under it. 16 U.S.C. § 3375(c). Section 258.14 of the underlying Interior regulations also expressly grants the Court of Indian Offenses jurisdiction to try Indians accused of violating the rules. Thus federal jurisdiction is concurrent, but it is not extinguished by the separate jurisdictional grant afforded by the underlying regulations.

### III. *Abrogation of Tribal Rights*

The central issue presented on appeal is whether the Government, acting in its role as trustee, improperly deprived Hoopa Valley Reservation Indians of their federally protected tribal right to take fish from the Klamath River. As held by the Ninth Circuit in *United States v. Fryberg*, 622 F.2d 1010, 1013 (9th Cir.), *cert. denied*, 449 U.S. 1004, 101 S.Ct. 545, 66 L.Ed.2d 301 (1980), the Government may not abrogate or modify Indian tribal rights without clear Congressional authorization. The question before this Court, therefore, is two fold: (1) whether the Interior regulations under which the appellees were prosecuted "modify or abrogate" Hoopa Valley Reservation

tribal rights, and (2) whether such an "abrogation," if found, was clearly authorized by Congress.

### A. Scope of Reserved Rights

In order to assess whether the Klamath River regulations modified or abrogated Hoopa Valley Reservation tribal rights, it is first necessary to determine the scope of these rights and whether the appellees' actions were within those rights. *See United States v. Dion*, 752 F.2d 1261, 1263 (8th Cir.1985). It is only when the scope of the rights is known that it can be determined whether or not governmental actions have modified or abrogated them.

The rights of the Yurok Indians to exploit resources on the Hoopa Valley Reservation were reserved by statute, not treaty. *Blake v. Arnett*, 663 F.2d 906, 909 (9th Cir.1981). The Hoopa Valley Reservation, as outlined by the Supreme Court in *Mattz v. Arnett*, 412 U.S. 481, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973), has had a complex history. By its Act of March 3, 1853, Congress authorized the President to make five military reservations from the public domain in California for Indian purposes. President Pierce, consistent with this authority, specified the Old Klamath River Reservation in his order of November 16, 1855. *Mattz*, 412 U.S. at 487, 93 S.Ct. at 2249. In 1876 a 12-mile square, known as the original Hoopa Valley Reservation, was formally set aside by another executive order. In 1891 President Harrison extended the reservation to encompass the Old Klamath River Reservation and added to the reservation a 30-mile strip connecting these two areas. *Mattz*, 412 U.S. at 502, 93 S.Ct. at 2256.

In establishing the Hoopa Valley Reservation, Congress reserved those rights necessary for the Indians to maintain on the land ceded to them their way of life, which included hunting and fishing. *Menominee Tribe of Indians v. United States*, 391 U.S. 404, 406, 88 S.Ct. 1705,

---

**4.** The legislative history of the Act indicates that Congress intended the Lacey Act to enhance enforcement of wildlife laws and regulations by "federalizing" the violation of other independent provisions. *See* H.R. No. 276, 97th Cong., 1st Sess. 13 (1981); S.Rep. No. 123, 97th Cong., 1st Sess. 4 (1981), U.S.Code Cong. & Admin.News 1981, p. 1748.

1707, 20 L.Ed.2d 697 (1968).[5] It makes little practical difference that Congress granted these rights by statute rather than by treaty. *Blake,* 663 F.2d at 909; *Arnett v. 5 Gill Nets,* 48 Cal.App.3d 454, 459, 121 Cal.Rptr. 906 (1975), *cert. denied,* 425 U.S. 907, 96 S.Ct. 1500, 47 L.Ed.2d 757 (1976). In determining the scope of those rights, therefore, the rules of Indian treaty construction should apply.

In construing Indian treaties, the courts have required treaties to be liberally construed to favor Indians, "ambiguous expressions in treaties must be resolved in favor of the Indians, and [the] treaties should be construed as the Indians would have understood them." *Dion,* 752 F.2d at 1263 (quoting *United States v. Top Sky,* 547 F.2d 486, 488 (9th Cir.1976)).

■ Neither the executive order of 1855 nor that of 1891 contain an express reservation of hunting and fishing rights. *Blake,* 663 F.2d at 909. Nonetheless, the fact that the reservation, when created, was riparian to the Klamath River leads inescapably to the conclusion that the right to take fish from the river was reserved to the tribe and that the Indians understood the reservation to include the right to fish. *Blake,* 663 F.2d at 911.

■ This right to take fish includes not only the right to catch fish for individual consumption, but also the right to engage in commercial taking. *See Dion,* 752 F.2d at 1265 n. 11. Interior, in both the regulations and at argument on this motion, has explicitly acknowledged the Hoopa Valley Reservation's tribal right to take fish for commercial purposes. 43 Fed.Reg. 30,048 (July 13, 1978); 44 Fed.Reg. 17,146, (March 20, 1979). "Based upon the history of Indian fishing on the Klamath, as well as on the substantial case law interpreting Federal fishing rights, the Department has concluded that the Indians' reserved fishing right includes the right to use fish for commercial purposes." 43 Fed.Reg. 30,048 (July 13, 1978).

■ Nonetheless, the Government contends that it may foreclose this right to fish commercially when it is done for "conservation" purposes. Interior relies on the *Puyallup* case authority holding that Indian rights to exploit reservation resources are, at their outer limit, subject to the environmental demands of species conservation. As noted by Justice Douglas in *Department of Game of Washington v. Puyallup Tribe,* 414 U.S. 44, 49, 94 S.Ct. 330, 334, 38 L.Ed.2d 254 (1973) (*Puyallup II*), Indian treaty rights do not give Indians a federal right "to pursue the last living steelhead until it enters their nets." Thus, the Yurok's federally reserved rights do not extend to include the right to fish anadromous species on the Klamath River to extinction. *Puyallup Tribe, Inc. v. Department of Game of Washington,* 433 U.S. 165, 175–76, 97 S.Ct. 2616, 2622–23, 53 L.Ed.2d 667 (1977) (*Puyallup III*). *See also Washington v. Washington State Commercial Passenger Fishing Vessel Association,* 443 U.S. 658, 684, 99 S.Ct. 3055, 3073, 61 L.Ed.2d 823 (1979).

---

**5.** Historical accounts of Indian ways and customs clearly establish the dependence of the tribes upon the Klamath River's resources. As described by an agent of the Indian Bureau, writing of the suitability of the Klamath River Indian country to the needs of the Indians: .

> [n]o place can be found so well adapted to these Indians, and to which they themselves are so well adapted, as this very spot. No possessions of the Government can be better spared to them. No territory offers more to these Indians and very little territory offers less to the white man. The issue of their removal seems to disappear.

*Report of the Commission of Indian Affairs* 266 (1885) (as quoted in *Mattz v. Arnett,* 412 U.S. at 487 n. 6, 93 S.Ct. at 2249 n. 6).

To modern Indians of the Hoopa Valley Reservation, fishing remains a way of life, not only consistent with traditional Indian customs, but also as an eminently practical means of survival in an area which lacks the broad industrial or commercial base which is required to provide its population, Indian or otherwise, with predictable full-time employment and income adequate to provide sufficient quantities and qualities of the necessaries of life. National Park Service, *Environmental Assessment: Management Options for the Redwood Creek Corridor, Redwood National Park* (1975).

The present situation is clearly distinguishable from this line of *Puyallup* authority. While *Puyallup II* holds that Indian rights can be controlled by the need to preserve a species, such an environmental crisis did not exist on the Hoopa Valley Reservation in 1979. Interior has not established or even claimed that anadromous fish in the Klamath River were on the verge of extinction when it promulgated its ban on Indian commercial fishing. As stated in the prologue to Interior's regulations, ocean fishing, which harvested the vast majority of Klamath and Trinity salmon, remained substantially unregulated.[6] Sports fishing by non-Indians on the Klamath was also allowed during this period. There is, in short, absolutely no evidence before this Court that at the time of the regulations Interior believed that the Hoopa Valley Reservation's fish resources were facing imminent extinction. In 1979, Congress could still have acted expressly to prohibit commercial fishing had it wished to do so. *See Dion,* 752 F.2d at 1268 n. 14.

### B. Modification or Abrogation

Given that the Indians of the Hoopa Valley Reservation had a reserved right to take Klamath River anadrogous fish for commercial purposes, it must next be determined whether Interior's regulations suspending all commercial fishing have, in fact, modified or abrogated that right. *See Dion,* 752 F.2d at 1265.

The Magistrate found that a six-year prohibition on the Yurok's tribal right to fish for commercial purposes constituted an "abrogation" of the treaty right. The Government disputes this on appeal, arguing instead that the regulations merely suspend the tribe's right without affecting it.

The issue of what action rises to the level of "abrogation" is a difficult one which has never been directly addressed by this circuit. In *United States v. Fryberg,* 622 F.2d 1010, 1014 (9th Cir.), *cert. denied,* 449 U.S. 1004, 101 S.Ct. 545, 66 L.Ed.2d 301

(1980), the Ninth Circuit held that the Eagle Protection Act's prohibition on taking of eagles by Indians constituted a "modification or abrogation" of treaty hunting rights. Acknowledging that the regulation in question involved only a "relatively insignificant modification of the Indian's hunting rights," the court still required a clear intention on the part of Congress to so affect those rights. *Id.*

■ The regulations at issue here constitute more than an "insignificant modification" of the Hoopa Valley Reservation Indians' reserved right to fish commercially. Instead, they rise to the level of "substantial infringement" of the type outlined in *Washington v. Washington State Commercial Passenger Fishing Vessel Association,* 443 U.S. at 690, 99 S.Ct. at 3077 (Fraser River Treaty between the United States and Canada could not infringe upon Indian rights absent express statutory language). As such, Interior's regulations "modify or abrogate" the Indians' treaty right so as to require express Congressional authorization.

### C. Congressional Authorization

■ It is undisputed that Congress can modify or abrogate reserved tribal rights. *See Lone Wolf v. Hitchcock,* 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299 (1903). The intention to do so, however, is not to be lightly imputed to Congress. *Menominee,* 391 U.S. at 413, 88 S.Ct. at 1711. As directed by *United States v. Fryberg,* 622 F.2d 1010, 1013 (9th Cir.), *cert. denied,* 449 U.S. 1004, 101 S.Ct. 545, 66 L.Ed.2d 301 (1980), the Court should look to surrounding circumstances and legislative history for evidence of Congress' intent to abrogate.

The Government maintains that it was specifically authorized to promulgate the Klamath River regulations based on three statutes: 43 U.S.C. § 1457; 25 U.S.C. §§ 2, 9, 13; and the Reorganization Plan No. 3 of 1950. *See* 44 Fed.Reg. 17,148 (March 20,

---

**6.** Between 1976–1984, ocean fishers took 67 percent of the available adult Klamath River chinook salmon, Indian fishers took 8 percent and sports fishers caught 2 percent. Bureau of Indian Affairs, *Environmental Impact Statement, Indian Fishing Regulations* 29 (1985).

1979) (authority). Under these statutes, Interior is authorized to supervise and manage Indian affairs. *McCovey*, 36 Cal.3d at 534 n. 21, 205 Cal.Rptr. 643, 685 P.2d 687. *See also Udall v. Littell,* 366 F.2d 668 (D.C.Cir.1966).[7]

The Government contends that this general statutory authorization constitutes sufficient evidence of Congress' intent to abrogate the Hoopa Valley Reservation's right to fish commercially. In support of its position, the Government cites several cases where Interior has acted under its general statutory authorization. In *Udall v. Littell,* 366 F.2d 668 (D.C.Cir.1966), the court held that Interior's cancellation of an attorney's contract with the tribe was a proper exercise of oversight authority. 366 F.2d at 674. In *United States v. Consolidated Mines & Smelting Co.,* 455 F.2d 432, 443 (9th Cir.1971), the court approved Interior's decision to halt the alienation of Colville tribal lands. In *Yavapai-Prescott Indian Tribe v. Watt,* 707 F.2d 1072 (9th Cir.1983), the court approved of Interior's decision to block the tribe's unilateral cancellation of a lease.

The Court rejects the Government's argument. The very broad grant of management authority given to Interior under these statutes is wholly inadequate to impute Congressional intent to modify the federally protected right to fish commercially held by the Hoopa Valley Reservation Indians. None of the cases cited by the appellant authorizes Interior's interference with reserved tribal rights absent Congressional authorization. The *Udall* and *Consolidated* cases each dealt specifically with a tribe's right to contract with private parties. In *Udall,* the tribe specifically asked the Secretary to investigate and terminate the contract if he discovered any improprieties. 366 F.2d at 671. In *Consolidated,* Interior had historically exercised its right to withhold public lands from private development. 455 F.2d at 442–44. More importantly, both of these cases involved only the management of tribal affairs by Interior, not the abrogation of federally protected tribal rights. Nor does *Yavapai-Prescott* support the Government's position. In that case, Congress had passed a specific statute authorizing the Secretary of Interior to approve leases of Indian land. 707 F.2d at 1074. Thus, Congress had explicitly authorized Interior's intervention.

■ It is clear from *Fryberg* that Congressional intent to abrogate or modify tribal rights must be clear from the face of the statute and the circumstances surrounding its passage.[8] Looking at the express language of the statutes relied upon by Interior to authorize its ban on Klamath River fishing, there is absolutely nothing to indicate that Congress authorized the abrogation of the Hoopa Valley Reservation's tribal right to fish commercially. Nor is there any basis for finding such Congressional intention in the legislative history of these acts. The authority now relied in part upon by the Secretary is derived from Statutes of 1832 and 1834, 4 Stat. 564 and 4 Stat. 735, 738. At the time Congress granted this authority, a "policy of almost total tribal self-government" prevailed. *Organized Village of Kake v. Egan,* 369 U.S. 60, 63, 82 S.Ct. 562, 564, 7 L.Ed.2d 573 (1962). It is impossible, therefore, to impute to Congress an intention to authorize Interior to abrogate Indian fishing rights on the Hoopa Valley Reservation almost 150 years later.

The Court agrees with the Magistrate that the general trust statutes relied upon by the Department of Interior do not constitute explicit Congressional intent necessary to abrogate or modify reserved tribal

7. [T]he very general language of these statutes makes it quite plain that the authority conferred on the Commissioner of Indian Affairs was intended to be sufficiently comprehensive to enable him ... to manage all Indian affairs, and all matters arising out of Indian relations. *Udall,* 366 F.2d at 673.

8. Where, as here, the inteference with tribal rights is substantial, the Court should rely more on express language of the statute and less on the surrounding circumstances to establish Congressional determination to modify or abrogate a right. *Fryberg,* 622 F.2d at 1014.

rights. Thus under *Fryberg,* the Interior regulations prohibiting the commercial fishing of anadromous fish on the Hoopa Valley Reservation are impermissible and invalid.

### IV. *Conclusion*

The Court, therefore, affirms the Magistrate on the following issues. Jurisdiction is properly within the federal court. The Indians of the Hoopa Valley Reservation have a reserved tribal right to fish for commercial purposes on the Klamath River. The regulations under which the appellees were prosecuted were invalid as an unauthorized modification of these treaty rights and, therefore, cannot support a prosecution under the Lacey Act. As the Court finds the regulations unauthorized, it is not necessary to reach the issues of whether the regulations were arbitrary and capricious or discriminatory.

The Court affirms the Magistrate's dismissal of the informations against the appellees.

IT IS SO ORDERED.