789 F.2d 1354
 UNITED STATES of America, Plaintiff-Appellant,
v.
Gig and Jeannette EBERHARDT, Defendants-Appellees.
UNITED STATES of America, Plaintiff-Appellant,
v.
Tom WILSON and Sonny Erickson, Defendants-Appellees.
UNITED STATES of America, Plaintiff-Appellant,
v.
Diane Sue MATTZ, Atone ("Tony") W. Folkins, and Randy Mattz,
Defendants-Appellees.
 Nos. 85-1212, 85-1213 and 85-1233.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Jan. 17, 1986.
Decided May 16, 1986.
 
 Blake A. Watson, U.S. Dept. of Justice, Land & Natural Resources Div., Washington, D.C., for plaintiff-appellant.
 Geoffrey Hansen, Asst. Federal Public Defender, Laurence J. Litcher, Serra, Perelson, Anton, & Lichter, San Francisco, Cal., Michael Pfeffer, California Indian Legal Services, Oakland, Cal., for defendants-appellees.
 Appeal from the United States District Court for the Northern District of California.
 Before POOLE and BEEZER, Circuit Judges, and JAMESON,* District Judge
 POOLE, Circuit Judge:
 
 
 1
 In these cases the United States appeals district court orders that dismissed criminal prosecutions charging appellees with unlawful sale of anadromous fish caught within the Hoopa Valley Indian Reservation. Appellees were accused of violating regulations promulgated by the Department of Interior (Interior) that prohibit commercial fishing by Indians on that part of the Klamath River flowing through the Reservation. The district courts held that the regulations are invalid as an unauthorized modification of the Indians' reserved tribal right to fish for commercial purposes. Because we find that the statutory provisions authorizing Interior to manage Indian affairs permit the regulation of fishing on the Hoopa Valley Reservation, we reverse and remand for further proceedings.
 
 I.
 
 2
 Appellees are members of the Yurok Indian Tribe who, along with the Hoopa Indians, occupy the Hoopa Valley Reservation in California's Del Norte and Humboldt counties.[1] Appellees were charged under section 3(a) of the Lacey Act Amendments of 1981, 16 U.S.C. Sec. 3372(a) (1982), which makes it unlawful to sell fish taken in violation of any law or regulation of the United States or the law of any state.[2] The regulation at issue here is contained in 25 C.F.R. Sec. 250.8(d)-(f) (1985), and prohibits commercial fishing for anadromous fish on the Hoopa Valley Reservation, but permits fishing for subsistence and ceremonial purposes.
 
 
 3
 The State of California has prohibited commercial fishing on the Klamath River since 1933. Cal. Fish & Game Code Sec. 8434 (West 1984). Interior began regulating Indian fishing on the Hoopa Valley Reservation in 1977. Interior responded to the regulatory void created after the California Court of Appeal held that the State could not regulate the right of Indians to fish on the Klamath River within the Reservation. Arnett v. 5 Gill Nets, 48 Cal.App.3d 454, 121 Cal.Rptr. 906 (1975), cert. denied, 425 U.S. 907, 96 S.Ct. 1500, 47 L.Ed.2d 757 (1976).[3] The 1977 regulations expressly limited commercial fishing by Indians to five fish per day. 42 Fed.Reg. 40,904, 40,905 (1977). Interim regulations promulgated in 1978 established a limited season for commercial fishing. 43 Fed.Reg. 30,047, 30,052 (1978). However, in that same year, due to perceived conservation problems, Interior prohibited commercial fishing by an emergency in-season adjustment. 43 Fed.Reg. 39,086 (1978).
 
 
 4
 In 1979, Interior's revised regulations prohibited all commercial fishing and all sales of anadromous fish taken by Indians on the Hoopa Valley Reservation. 44 Fed.Reg. 17,144 (1979). The regulations allowed fishing for ceremonial and consumptive purposes, and, while recognizing the Indians' reserved right to fish commercially, nonetheless imposed a moratorium on commercial fishing. Interior justified the moratorium because the anadromous fish runs were not large enough to sustain commercial fishing as well as consumptive and escapement needs.[4] Interior indicated that commercial fishing rights could be resumed in the future when the fishery runs increased sufficiently to withstand the increased harvest. Id. at 17,146. The moratorium remained in effect in subsequent versions of the regulations and continues today. 25 C.F.R. Sec. 250.8(e) (1985).
 
 
 5
 In the cases of United States v. Eberhardt, No. 85-1212, and United States v. Wilson, No. 85-1213, two informations were filed against the four appellees in June 1984. Wilson was charged in Count One of the first information with selling salmon on September 10, 1982 in violation of the regulations. Counts Two through Five jointly charged Wilson and Erickson with selling salmon, steelhead, and sturgeon on four occasions between September 17, 1982 and June 17, 1983. Three counts of a superceding information charged Jeannette Eberhardt with selling salmon and sturgeon in violation of the regulations on three occasions between June 26, 1982 and September 6, 1982. Gig Eberhardt was charged with two counts of selling salmon and sturgeon in violation of California Fish and Game Code Sec. 8685.6 (West 1984), which prohibits the use of gill nets.[5]
 
 
 6
 These appellees consented to have their cases heard by a magistrate and the proceedings were consolidated. The parties agreed that the Indians have federally reserved commercial fishing rights based on the statutes authorizing creation of the reservation. The government claimed, however, that those rights are not absolute and that the ban on commercial fishing was justified as a temporary conservation measure. Tom Wilson and Jeannette Eberhardt moved to have the informations dismissed. They did not challenge the facts alleged in the informations, but argued that the regulations prohibiting commercial fishing on the reservation were invalid as an unauthorized modification or abrogation of their right to take Klamath River fish.
 
 
 7
 On March 5, 1985, the magistrate granted the motions to dismiss. The magistrate held that Interior was without authority to promulgate regulations that abrogated federally reserved tribal fishing rights. The magistrate also held that even if Interior were authorized to regulate fishing, the regulations as written were arbitrary, not necessary to achieve a conservation purpose, and discriminatory.
 
 
 8
 On the government's appeal, District Judge Eugene Lynch reviewed the magistrate's decision de novo and affirmed the dismissal of the informations in a published memorandum opinion. United States v. Wilson, 611 F.Supp. 813 (N.D.Cal.1985). The district court held the regulations to be invalid because they impermissibly modified or abrogated the Indians reserved right to fish commercially. The court found in the general trust statutes relied upon by Interior no reflection of the congressional intent necessary to abrogate reserved tribal rights as required by United States v. Fryberg, 622 F.2d 1010 (9th Cir.), cert. denied, 449 U.S. 1004, 101 S.Ct. 545, 66 L.Ed.2d 301 (1980). While recognizing that Indian rights can be controlled to preserve a species, the district court rejected Interior's argument that the ban on commercial fishing was a valid conservation measure because no evidence had been presented showing that the Reservation's fish resources would otherwise face imminent extinction. As the court found the regulations unauthorized, it did not reach the issues whether the regulations were arbitrary and capricious or whether they discriminated against the Indians in view of the allowance of relatively unrestricted commercial fishing offshore.
 
 
 9
 In the separate case of United States v. Mattz, No. 85-1233, an eight-count indictment was filed against the three appellees in February 1985. Diane Mattz and Folkins were charged with selling between 700 and 940 pounds of salmon and steelhead in violation of the federal regulations on five occasions between September 22, 1983 and February 19, 1985.[6] Diane Mattz and Randy Mattz were charged with selling 500 pounds of steelhead on December 20, 1984. All three appellees were also charged with conspiracy to violate the federal regulations, and with conspiracy to defraud the United States by obstructing Interior's efforts to protect the fishery resources of the Klamath River.
 
 
 10
 On March 19, 1985, appellees filed a joint motion to dismiss before District Judge Thelton Henderson, arguing that the regulations were invalid because the ban on commercial fishing was not necessary for a conservation purpose and discriminated against Indians. Relying on Judge Lynch's earlier decision in Wilson, Judge Henderson granted the motion to dismiss the indictment on July 1, 1985.
 
 
 11
 The government appealed the district court orders dismissing these criminal prosecutions and these cases were argued together before this panel. Because Judge Henderson relied exclusively on Judge Lynch's decision, references to "the district court" in the remainder of this opinion relate to the analyses set forth in United States v. Wilson, 611 F.Supp. 813 (N.D.Cal.1985).
 
 II.
 
 12
 The district court had jurisdiction over these Lacey Act prosecutions. 16 U.S.C. Sec. 3375(c) (1982); United States v. Sohappy, 770 F.2d 816, 818-22 (9th Cir.1985). Appellate jurisdiction over government appeals in criminal cases is generally authorized by 18 U.S.C. Sec. 3731 (1982). United States v. Schwartz, 785 F.2d 673, 677 (9th Cir.1986). The district court's determination that the regulations are invalid as an unauthorized abrogation of tribal rights constitutes a finding of law subject to de novo review. See United States v. McConney, 728 F.2d 1195, 1201 (9th Cir.) (en banc), cert. denied, --- U.S. ----, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).
 
 III.
 
 13
 The issue before us is whether the informations and indictment were subject to dismissal because Interior lacks authority to impose a moratorium on commercial fishing on the Klamath River by Indians of the Hoopa Valley Reservation. The validity of the moratorium depends on whether Congress has given Interior express or implied statutory authority to regulate Indian fishing. The district court found that the imposition of a ban on commercial fishing impermissibly abrogates the Indians' tribal rights; it did not directly decide whether Interior has the authority to regulate Indian fishing.
 
 
 14
 Before discussing Interior's authority to promulgate these regulations, we note that the district court adopted too narrow a view in focusing exclusively on the Indians' general right to fish commercially. The right to take fish from the Klamath River was reserved to the Indians when the reservation was created. See Blake v. Arnett, 663 F.2d 906, 911 (9th Cir.1981); People v. McCovey, 36 Cal.3d 517, 534, 205 Cal.Rptr. 643, 653, 685 P.2d 687, 697, cert. denied, --- U.S. ----, 105 S.Ct. 544, 83 L.Ed.2d 432 (1984). However, the right reserved includes fishing for ceremonial, subsistence, and commercial purposes. Interior balanced the Indians' interest in fishing for these various purposes in promulgating the regulations. By according a priority to subsistence and ceremonial fishing, and imposing the moratorium on commercial fishing, Interior sought to respond to comments reflecting the views of the majority of the Indians on the Reservation. 44 Fed.Reg. 17,144, 17,146 (1979).
 
 
 15
 The ban on commercial fishing is one component of a comprehensive regulatory scheme established by Interior to deal with the exigent problems of Indian fishing on the Hoopa Valley Reservation. The regulations were promulgated by Interior pursuant to its responsibilities as trustee to preserve and protect Indian resources, and were designed "to allow for the exercise of Indian fishing rights consistent with conservation of the resource." 44 Fed.Reg. 17,144 (1979). The regulations aim at promoting equal access to the Klamath River fishery resource by all Indians of the Reservation, and at assuring adequate spawning escapement. 25 C.F.R. Sec. 250.1(a) (1985).
 
 
 16
 At oral argument, appellees conceded that Interior has general authority to regulate Indian fishing. They challenge none of the other regulatory provisions, such as restrictions on the type, number, and permissible location of nets, 25 C.F.R. Sec. 250.8(g)-(s) (1985), or the catch marking, reporting, and transportation requirements, id. Secs. 250.9, 250.12. Appellees claim only that Congress has not authorized the abrogation of reserved tribal rights effected by the ban on commercial fishing.
 
 
 17
 Interior's authority for issuing the Hoopa Valley Reservation fishing regulations arises from the statutory delegation of powers contained in 25 U.S.C. Secs. 2, 9 (1982).[7] These provisions generally authorize the Executive to manage Indian affairs but do not expressly authorize Indian fishing regulation. However, ever since these statutes were enacted in the 1830's, they have served as the source of Interior's plenary administrative authority in discharging the federal government's trust obligations to Indians.[8] We conclude that these statutory provisions give Interior sufficient authority to promulgate the Indian fishing regulations at issue here and consequently, we reject appellees' argument that the regulations are invalid in the absence of specific legislation giving Interior authority to regulate Indian fishing.
 
 
 18
 Appellees rely on Village of Kake v. Egan, 369 U.S. 60, 82 S.Ct. 562, 680, 7 L.Ed.2d 573, 636 (1962), in which the Supreme Court noted that the authority conferred under 25 U.S.C. Secs. 2, 9, does not give Interior "a general power to make rules governing Indian conduct." 369 U.S. at 63, 82 S.Ct. at 564. See also Santa Rosa Band of Indians v. Kings County, 532 F.2d 655, 665 (9th Cir.1975), cert. denied, 429 U.S. 1038, 97 S.Ct. 731, 50 L.Ed.2d 748 (1977). However, Village of Kake involved Interior regulations that conflicted with Alaska's efforts to enforce a conservation statute by conferring fishing rights on nonreservation Indians, and does not control here. In Village of Kake Interior had issued regulations, purportedly under authority of the White Act, 48 U.S.C. Secs. 221-228, and the Alaska Statehood Act, 72 Stat. 339 (1958), permitting the Indians to use fish traps prohibited by the state statute, in effect granting them fishing rights not previously held. Rejecting that argument, the Court emphasized that the cited statutes gave Interior the power to regulate the exercise of existing rights, not to grant new rights, and that none of the Indians affected belonged to a reservation, which might have given Interior authority to permit Indian fishing contrary to state law.[9] The Court then noted that 25 U.S.C. Secs. 2, 9, did not provide an independent basis of authority for the regulations in question. 369 U.S. at 63, 82 S.Ct. at 564.
 
 
 19
 In contrast to Village of Kake, these cases involve regulations managing the rights of reservation Indians fishing on their reservation. The regulations here do not grant Hoopa Valley Reservation Indians fishing rights; these rights were granted by Congress when it authorized the President to create the Reservation for Indian purposes. People v. McCovey, 36 Cal.3d at 534, 205 Cal.Rptr. at 653, 685 P.2d at 697. Moreover, contrary to the district court's conclusion, Interior invokes the general trust statutes only as constituting authority to enact regulations to protect and conserve the fishery resource for the benefit of Indians, not as power to abrogate reserved tribal rights.
 
 
 20
 We hold that the general trust statutes in Title 25 do furnish Interior with broad authority to supervise and manage Indian affairs and property commensurate with the trust obligations of the United States. See Udall v. Littell, 366 F.2d 668, 672-73 (D.C.Cir.1966) (Interior's authority to cancel a contract between tribe and attorney is inherent in powers delegated to the agency by Congress), cert. denied, 385 U.S. 1007, 87 S.Ct. 713, 17 L.Ed.2d 545 (1967); Armstrong v. United States, 306 F.2d 520, 522 (10th Cir.1962) ("management of water and water projects on a reservation is clearly within the scope of the general statutory authority" granted to Interior); see also Santa Rosa Band of Indians, 532 F.2d at 666 n. 19 (noting that 25 U.S.C. Sec. 2 may be sufficient to sustain Interior regulations administering Indian land given the nature of the trust relationship between the federal government and the Indian tribes).
 
 
 21
 Since its decision in Village of Kake, the Supreme Court has acknowledged Interior's authority to issue fishing regulations under the "general Indian powers" conferred by 25 U.S.C. Secs. 2, 9. Washington v. Washington State Commercial Passenger Fishing Vessel Association, 443 U.S. 658, 691, 99 S.Ct. 3055, 3077, 61 L.Ed.2d 823 (1979). See also United States v. Michigan, 623 F.2d 448, 450 (6th Cir.1980) (upholding Interior regulations issued pursuant to 25 U.S.C. Secs. 2, 9, governing treaty fishing rights in the Great Lakes), remand order continued as modified, 653 F.2d 277 (6th Cir.), cert. denied, 454 U.S. 1124, 102 S.Ct. 971, 71 L.Ed.2d 110 (1981). Congress must be assumed to have given Interior reasonable power to discharge its broad responsibilities for the management of Indian affairs effectively. Udall v. Littell, 366 F.2d at 672. Therefore, we hold that Interior has authority under 25 U.S.C. Secs. 2, 9, to regulate Indian fishing on the Hoopa Valley Reservation consistent with its obligations to manage and conserve Indian resources.
 
 IV.
 
 22
 We next consider the proper standard of review of regulations promulgated by Interior in the exercise of its trust responsibilities. We need not consider regulations purporting to implement statutorily mandated abrogation of previous rights because this case does not involve a congressional statute modifying Indian rights. But the validity of these regulations need not be reviewed under standards applicable to state conservation measures either, because this case does not involve the exercise of a state's police power to regulate tribal rights. The challenge to these fishing regulations should be considered under standards generally applicable to an attack on agency rule making.
 
 
 23
 Only Congress can modify or abrogate Indian tribal rights; it will be held to have done so only when its intention to do so has been made absolutely clear. United States v. State of Washington, 641 F.2d 1368, 1371 (9th Cir.1981), cert. denied, 454 U.S. 1143, 102 S.Ct. 1001, 71 L.Ed.2d 294 (1982); Menominee Tribe v. United States, 391 U.S. 404, 412-13, 88 S.Ct. 1705, 1710-11, 20 L.Ed.2d 697 (1968); Lone Wolf v. Hitchcock, 187 U.S. 553, 566, 23 S.Ct. 216, 221, 47 L.Ed. 299 (1903). But congressional intent to abrogate tribal rights may be found in the express provisions of an act or in its surrounding circumstances and legislative history. Washington State Charterboat Association v. Baldrige, 702 F.2d 820, 823 (9th Cir.1983), cert. denied, 464 U.S. 1053, 104 S.Ct. 736, 79 L.Ed.2d 194 (1984).
 
 
 24
 In United States v. Fryberg, we found that in enacting the Eagle Protection Act, 16 U.S.C. Secs. 668-668d (1982), Congress intended to permanently modify Indian tribal rights by prohibiting the taking of bald eagles without a permit.[10] 622 F.2d at 1016. Given the broad purpose of the Act to protect the bald eagle and prevent its extinction, we held that Congress could prohibit all threats to the species without regard to the existence of treaty hunting rights. Id. In this case, Interior's regulations are designed to manage the fishery for the benefit of the Indians, not to extinguish any reserved tribal fishing rights. Interior makes clear the temporary nature of the ban and that commercial fishing will be allowed to resume when the fishery can withstand the increased harvest. Thus, the district court erred in analogizing this case to the ban on taking bald eagles in Fryberg and thereby finding these regulations invalid in the absence of demonstrated congressional intent to work an abrogation of the Indians' fishing rights.
 
 
 25
 Unlike Congress, states may not qualify Indian fishing rights. Puyallup Tribe v. Department of Game (Puyallup I), 391 U.S. 392, 398, 88 S.Ct. 1725, 1728, 20 L.Ed.2d 689 (1968); Sohappy, 770 F.2d at 823; Fryberg, 622 F.2d at 1014-15. However, states may regulate Indian rights in the interest of conservation by an appropriate exercise of their police power. State regulation for conservation purposes is based on the state's interest in protecting fish and wildlife resources for the benefit of its citizens. See Puyallup Tribe v. Department of Game (Puyallup III), 433 U.S. 165, 175-76, 97 S.Ct. 2616, 2622-23, 20 L.Ed.2d 689 (1977); see also United States v. Michigan, 653 F.2d 277, 279 (6th Cir.), cert. denied, 454 U.S. 1124, 102 S.Ct. 971, 71 L.Ed.2d 110 (1981). The violation of state conservation laws is a federal offense. 16 U.S.C. Sec. 3372(a)(2) (1982); see Sohappy, 770 F.2d at 823-24.
 
 
 26
 A state must show that any regulation of Indian fishing rights is both reasonable and necessary for conservation purposes. Antoine v. Washington, 420 U.S. 194, 207, 95 S.Ct. 944, 951, 43 L.Ed.2d 129 (1975); Sohappy, 770 F.2d at 823. State regulations meeting these standards may extend to the manner of fishing, the size of the take, and the restriction of commercial fishing. Puyallup I, 391 U.S. at 398, 88 S.Ct. at 1728. In the context of state regulation of Indian fishing rights, we have rejected the endangered species approach to conservation, finding that fishing limitations may be proper even though extinction is not imminent. United States v. Oregon, 718 F.2d 299, 305 (9th Cir.1983).
 
 
 27
 This case involves regulations promulgated by Interior acting as trustee for the tribes occupying the Hoopa Valley Reservation, rather than state regulation designed to protect the interests of non-Indians. The type of showing of conservation necessity required to justify state regulation of Indian fishing has not been precisely defined. Id. at 303. However, as appellees recognize, Interior has a broader scope of authority to regulate Indian fishing than do the states. Therefore, it is clear that the district court erred in requiring Interior to justify the ban on commercial fishing by showing that the fish resources of the Hoopa Valley Reservation were facing imminent extinction.
 
 
 28
 Interior promulgated the Indian fishing regulations, including the commercial fishing moratorium, pursuant to the rule making provisions of the Administrative Procedure Act, 5 U.S.C. Sec. 553 (1982). The scope of judicial review of challenges to agency action, including administrative rule making, is set forth in 5 U.S.C. Sec. 706 (1982). See Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 413-14, 91 S.Ct. 814, 822, 28 L.Ed.2d 136 (1971). These standards apply to appellees' challenge to the regulations at issue in this case.
 
 
 29
 The Indian fishing regulations may be set aside if they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. See 5 U.S.C. Sec. 706(2)(A) (1982); Citizens to Preserve Overton Park, 401 U.S. at 413-14, 91 S.Ct. at 822; American Tunaboat Association v. Baldrige, 738 F.2d 1013, 1016 (9th Cir.1984). Moreover, Interior must have observed the procedures required by law in promulgating the regulations. See 5 U.S.C. Sec. 706(2)(D) (1982); Citizens to Preserve Overton Park, 401 U.S. at 414, 91 S.Ct. at 822. However, absent a finding that Interior improperly exercised its rule making authority, there is no basis to invalidate these regulations despite their impact in managing the fishing rights of Hoopa Valley Reservation Indians.
 
 V.
 
 30
 The district court found the regulations under which the appellees were prosecuted invalid as an unauthorized modification of reserved tribal rights and did not consider whether the regulations are arbitrary and capricious or discriminatory. We decline to reach these issues here. Because we hold that Interior did not exceed its statutory authority in promulgating fishing regulations for the Hoopa Valley Reservation, we REVERSE the district court orders which dismissed the informations and indictment in these cases on the ground that the regulations are unauthorized. We order the prosecutions reinstated and REMAND for further proceedings consistent with this opinion.
 
 BEEZER, Circuit Judge, concurring:
 
 31
 I concur in the opinion of the court. I write separately to express deep concerns about the disjoined management of the Klamath River basin anadromous fishery resource. This fishery is managed separately by the Department of Commerce and the Department of the Interior with an apparent lack of any coordination. The primary victims of this mis-management have been the Indians on the Hoopa Valley Indian Reservation, who are being deprived of any commercial access to this valuable resource.
 
 
 32
 Anadromous fish hatch in freshwater streams and rivers, migrate to the ocean where they mature, and return to the freshwater places of their birth to spawn and die. The preservation of the species depends on an adequate level of escapement, i.e., sufficient numbers of fish avoiding capture and returning up-river from the ocean to spawn. Thus, any effort to conserve this dwindling resource demands coordinated regulation of harvests at every stage of migration.
 
 
 33
 The Department of the Interior, exercising its general authority over Indian affairs under 25 U.S.C. Secs. 2 and 9, has imposed a ban on commercial fishing by Indians on the reservation as a necessary measure to conserve the severely depressed anadromous fishery resource.
 
 
 34
 The ocean fishery is managed by the Pacific Fishery Management Council (PFMC), established by the Fishery Conservation and Management Act of 1976, 16 U.S.C. Sec. 1852(a)(6), which recommends ocean fishing regulations to the Department of Commerce. See generally Hoh Indian Tribe v. Baldridge, 522 F.Supp. 683, 685 (W.D.Wash.1981).
 
 
 35
 The Indian defendants in this case quite properly claim that, since the Department of Commerce fails to provide for adequate escapement from the coastal waters, the Indians on the Hoopa Valley Reservation must bear most of the burden of conservation measures. While the Department of the Interior has imposed a moratorium on commercial fishing by Indians, offshore domestic and foreign commercial fisheries continue to harvest the same fish that spawn in the Klamath River basin.
 
 
 36
 It is apparent that over-harvesting by the ocean fisheries, resulting in too few anadromous fish returning to the Klamath River to meet spawning escapement goals, has been the primary cause for depletion of this natural resource.[1] The ocean fisheries have not been required to bear their full share of the conservation burden.
 
 
 37
 In recent years, the Department of Commerce has taken some initial steps in the right direction. However, while there has been some shortening of the commercial fishing season in coastal waters, it appears that shortened seasons result only in more intense fishing during that period. In 1985, the Department closed the coastal waters between Point Delgada, California, and Cape Blanco, Oregon to commercial fishing. It remains to be seen whether this will prove successful. The anadromous fish that spawn in the Klamath River basin range far and wide in the ocean, and it may be that only catch limits will meet conservation goals.
 
 
 38
 It must be remembered that the trust duty to reservation Indians is owed, not just by the Department of the Interior, but by the entire federal government. Until both the Department of the Interior and the Department of Commerce coordinate fishery management, the Indians will be denied their fair share, or any commercial share for that matter, of the available resource. The right to take fish from the Klamath River was reserved to the Indians when the Hoopa Valley Reservation was created. Cooperation among all agencies of the government is essential to preserve those Indian fishing rights to the greatest extent possible. Any sacrifice necessary to conserve the fishery resource should be fairly shared among all fish harvesters.
 
 
 
 *
 The Honorable William J. Jameson, Senior United States District Judge for the District of Montana, sitting by designation
 
 
 [1]
 For a description of the geography and history of the Hoopa Valley Reservation, see United States v. Wilson, 611 F.Supp. 813, 815 (N.D.Cal.1985). See also Mattz v. Arnett, 412 U.S. 481, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973)
 
 
 [2]
 16 U.S.C. Sec. 3372(a) provides in part:
 It is unlawful for any person--
 (1) to import, export, transport, sell, receive, acquire, or purchase any fish or wildlife or plant taken or possessed in violation of any law, treaty, or regulation of the United States or in violation of any Indian tribal law;
 (2) to import, export, transport, sell, receive, acquire, or purchase in interstate or foreign commerce--
 (A) any fish or wildlife taken, possessed, transported, or sold in violation of any law or regulation of any State or in violation or any foreign law * * * *
 
 
 [3]
 In an amicus brief filed with this court, the State of California argues that it has jurisdiction to regulate Indian fishing on the Klamath River. We find it unnecessary to consider the State's arguments, raised for the first time on appeal, in deciding whether the district court properly found that Interior is without authority to impose a moratorium on commercial fishing by Indians. However, we note that California courts have rejected the State's claim of regulatory authority over Indian fishing within the Hoopa Valley Reservation. Arnett v. 5 Gill Nets, 48 Cal.App.3d at 459-64, 121 Cal.Rptr. at 909-13; People v. McCovey, 36 Cal.3d 517, 533-34, 205 Cal.Rptr. 643, 652-53, 685 P.2d at 696-97, (specifically rejecting argument that Interior has no authority to promulgate Indian fishing regulations for the Hoopa Valley Reservation and finding that Interior regulations preempt state law), cert. denied, --- U.S. ----, 105 S.Ct. 544, 83 L.Ed.2d 432 (1984)
 
 
 [4]
 Anadromous species hatch in fresh water, grow to maturity in the ocean, and return to fresh-water streams to spawn. Escapement means the number of fish avoiding capture and returning upriver to spawn. Escapement needs estimate escapement levels necessary to achieve a certain population level in the next generation
 
 
 [5]
 State fishing laws apply to Gig Eberhardt, the only appellee who is a non-Indian. The Interior regulations do not apply to non-Indians. 25 C.F.R. Sec. 250.3(b) (1985)
 
 
 [6]
 Two of these five counts also charged violations of California law, which prohibits the use of gill nets, Cal. Fish & Game Code Sec. 8685.6 (West 1984), and Oregon law, which prohibits the transport or sale of fish caught during the closed season, Or.Rev.Stat. Sec. 509.011 (1985)
 
 
 [7]
 25 U.S.C. Sec. 2 provides:
 The Commissioner of Indian Affairs shall, under the direction of the Secretary of the Interior, and agreeably to such regulations as the President may prescribe, have the management of all Indian affairs and of all matters arising out of Indian relations.
 25 U.S.C. Sec. 9 provides:
 The President may prescribe such regulations as he may think fit for carrying into effect the various provisions of any act relating to Indian affairs, and for the settlement of the accounts of Indian affairs.
 Interior also claimed authority under 43 U.S.C. Sec. 1457 (1982), and the Reorganization Plan No. 3 of 1950 (64 Stat. 1262). 25 C.F.R. Part 250 (1985).
 
 
 [8]
 Sections 2 and 9 of Title 25 also provide a statutory basis for Interior regulations administering Indian lands and managing other Indian fishery resources. See, e.g., 25 C.F.R. Sec. 162 (1985) (leasing and permitting on Indian land); id. Sec. 163 (forest regulations); id. Sec. 166 (grazing regulations); id. Sec. 241 (Indian fishing in Alaska); id. Sec. 242 (commercial fishing on the Red Lake Reservation); id. Sec. 248 (Indian fishing on the Columbia River); id. Sec. 249 (off-reservation fishing)
 
 
 [9]
 The companion case of Metlakatla Indian Community v. Egan, 369 U.S. 45, 82 S.Ct. 552, 7 L.Ed.2d 562 (1962), involved application of the Interior regulations to reservation Indians. As in Village of Kake, the Court held the regulations invalid under the White Act and the Alaska Statehood Act because neither statute gave Interior authority to permit Indian fishing in violation of state law. 369 U.S. at 54, 82 S.Ct. at 558. However, the Court found that the 1891 Act establishing the Metlakatla Reservation, to be used by the Indians "under such rules and regulations * * * as may be prescribed" by Interior, might provide authority for the fishing regulations. Id. at 54-59, 82 S.Ct. at 558-61
 
 
 [10]
 But cf. United States v. Dion, 752 F.2d 1261 (8th Cir.1985) (en banc) (Eagle Protection Act does not reflect congressional intent to abrogate Indian treaty right to hunt eagles on reservation for noncommercial purpose), on remand, 762 F.2d 674 (8th Cir.), cert. granted, --- U.S. ----, 106 S.Ct. 270, 88 L.Ed.2d 225 (1985)
 
 
 [1]
 Between 1976 and 1984, 67 percent of the fish taken were harvested by commercial fisheries and only 8 percent by Indian gill net fishers. Bureau of Indian Affairs, Environmental Impact Statement, Indian Fishing Regulations 29 (1985). In 1983, the year for which defendants are charged with selling salmon, 79 percent of the Klamath River anadromous fish taken were harvested by ocean fisheries, and only 13.6 percent by reservation Indians. Certified Record 33, Exhibit B