[No. S002805. Aug. 22, 1988.]

DIANE SUE MATTZ et al., Petitioners, v.
THE SUPERIOR COURT OF DEL NORTE COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

**COUNSEL**

George Forman and Dohn Henion, under appointments by the Supreme Court, Alexander & Karshmer, William Follett, Schafer, Cochran & Follett, Michael S. Pfeffer, Stephen V. Quesenberry and Steven Hirsh for Petitioners.

No appearance for Respondent.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, R. H. Connett, Assistant Attorney General, Roderick E. Walston, Ronald D. Smetana, Charles W. Getz IV, Bruce S. Flushman and

Mary E. Hacenbracht, Deputy Attorneys General, for Real Party in Interest.

## OPINION

ARGUELLES, J.—In 1981, the People filed criminal charges against Diane Sue Mattz, Antone Folkins and Kenneth Mattz (hereafter defendants) —three Yurok Indians of the Hoopa Valley Indian Reservation in Northern California—arising out of defendants' alleged commercial fishing activities in the Klamath River on the reservation.[1] Before trial, defendants challenged the state's authority to pursue the prosecutions, and in 1984, while this writ proceeding was pending in the Court of Appeal, we held in *People v. McCovey* (1984) 36 Cal.3d 517 [205 Cal.Rptr. 643, 685 P.2d 687] that the comprehensive federal regulation of Indian fishing rights on the Hoopa Valley Indian Reservation preempts the state from criminally prosecuting Yurok Indians for such activity. Although acknowledging the similarity between the present proceeding and *McCovey,* the Court of Appeal found that *McCovey* was not controlling for a number of reasons and held that the underlying criminal prosecutions could go forward. We granted review to consider the validity of the Court of Appeal's interpretation and application of *McCovey* and now reverse the Court of Appeal judgment.

I

In September 1981, defendants were charged with violating and conspiring to violate criminal provisions of the California Fish and Game Code which prohibit (1) the sale of fish taken in the Klamath River District, and (2) the sale, or possession for sale, of any salmon, steelhead or striped bass, taken in California waters by means of a gill net. (Fish & G. Code, §§ 8434, 8685.6; Pen. Code, § 182.) The evidence presented at the preliminary hearing established that defendants are Yurok Indians of the Hoopa Valley Indian Reservation and that the charged offenses involved fish caught within the boundaries of the reservation. On the basis of that evidence, the magistrate dismissed the charges, concluding that the state lacked jurisdiction to prosecute defendants for such fishing activities in reservation waters.

The People then moved in superior court to reinstate the charges. The superior court, relying in large part on the fact that the federal regulations

---

[1] Diane Sue Mattz died during the pendency of this proceeding. Because the title of the proceeding below bears her name, we have retained the title for consistency. (See Cal. Style Manual (3d ed. 1986) § 211, p. 145.)

in effect at the time of the alleged offenses barred commercial fishing by Indians in the Klamath River, found that state prosecutions for such conduct were not preempted and reinstated the charges. Defendants' subsequent motion to dismiss was denied by the superior court in August 1983.

In September 1983, defendants filed the present writ proceeding in the Court of Appeal, maintaining, inter alia, that California lacks jurisdiction to prosecute Indians of the Hoopa Valley Reservation under state law for offenses arising from on-reservation fishing. As noted, at the time the writ petition was filed, a case presenting a similar legal issue—*People* v. *McCovey, supra,* 36 Cal.3d 517—was pending before our court. Recognizing that the decision in *McCovey* might well be dispositive of this matter, defendants, at the People's request, waived their rights to a speedy trial "to a date ninety (90) days after the filing of the remittitur" in *McCovey,* and the Court of Appeal held this matter in abeyance pending our *McCovey* decision.

We handed down our decision in *McCovey* in July 1984, concluding generally that the comprehensive federal regulation of Indian fishing rights on the Hoopa Valley Reservation preempted state criminal prosecutions both of Indian fishing activities on the reservation and of the off-reservation sale by reservation Indians of fish that had been caught on the reservation. The People sought certiorari in the United States Supreme Court, but that court denied the petition for certiorari in November 1984. (*California* v. *McCovey* (1984) 469 U.S. 1062 [83 L.Ed.2d 432, 105 S.Ct. 544].)

A few weeks thereafter, the People filed an opposition brief in the present writ proceeding in the Court of Appeal, contending that the *McCovey* decision was not dispositive of this proceeding and arguing—on the basis of historical documents of which it urged the court to take judicial notice— that the Yurok Indians possess no federally protected fishing rights in the Klamath River and that the federal government lacked the constitutional authority to adopt the regulations which *McCovey* had found preempted state criminal prosecutions. Ten months later, in October 1985, after the People had filed several additional letter briefs, defendants filed a notice of abandonment of the writ proceeding in the Court of Appeal. The Court of Appeal initially summarily dismissed the proceeding pursuant to the abandonment, but when the People informed the appellate court that it had not received notice of the proposed abandonment and urged the court to vacate the dismissal, the Court of Appeal vacated the dismissal order and reinstated the proceeding.

In October 1987, the Court of Appeal rendered its decision in this matter. Although the Court of Appeal recognized that the *McCovey* decision "would at first blush appear to entitle [defendants] to a writ of prohibition

restraining further prosecution on the state criminal charges," the court went on to conclude that *McCovey* did not require it to issue such a writ. The Court of Appeal did not, however, embrace the People's assertion that the federal government lacked the constitutional authority to promulgate regulations governing Indian fishing rights on the Hoopa Valley Reservation, but instead held that the state's interest in conservation justifies concurrent state and federal regulatory jurisdiction over commercial Klamath River fishing and that *McCovey* did not preclude the state from exercising such jurisdiction even with respect to on-reservation fishing activities by Yurok Indians. Accordingly, it denied the writ petition, permitting the underlying criminal prosecutions against defendants to go forward.

We granted review to determine the validity of the Court of Appeal's interpretation and application of *McCovey*.

## II

As a threshold matter, defendants contend that the Court of Appeal lacked jurisdiction to render its decision on the merits of this writ proceeding. On October 7, 1985, after the matter had been fully briefed in the Court of Appeal, defendants, who had instituted this writ proceeding, filed a "notice of abandonment" of the writ petition with the Court of Appeal (see Cal. Rules of Court, rules 19, 38, 53), requesting that the court "order the dismissal of the writ and the issuance of their remittitur." Defendants evidently did not serve the People with a copy of the notice of abandonment and the clerk of the court also apparently failed to immediately notify the People of the filing of the notice. (See Cal. Rules of Court, rules 19(c), 38.) On October 15, 1985, the Court of Appeal, having received no opposition from the People, summarily dismissed the petition pursuant to the abandonment.

The People received notice of the dismissal on October 16, 1985, and immediately filed a motion requesting the Court of Appeal to vacate its order of dismissal. In their motion, the People pointed out that they had not received notice of the proposed abandonment, and urged the court to vacate the dismissal and retain the case in light of the important public question presented by the proceeding. (See, e.g., *Lucchesi* v. *City of San Jose* (1980) 104 Cal.App.3d 323, 326, fn. 2 [163 Cal.Rptr. 700].)[2] On October 25, 1985,

---

[2] In urging the Court of Appeal to retain the case, the People argued that the federal government's ability to effectively regulate Indian fishing had been seriously impaired by the then-recent federal district court decision in *United States* v. *Wilson* (N.D.Cal. 1985) 611 F.Supp. 813, in which the court had invalidated a federal regulation prohibiting all on-reservation commercial fishing by Yurok Indians on the ground that the federal agency which had

the Court of Appeal issued an order vacating its initial dismissal order and reinstating the writ proceeding. Defendants did not challenge the validity of the order vacating dismissal at that point, and the Court of Appeal went on to decide the writ petition on the merits.

Defendants now contend that the Court of Appeal lacked jurisdiction to decide the matter. Although defendants acknowledge that under rules 19(b) and 38 of the California Rules of Court the Court of Appeal had discretion to decline to accede to their proposed abandonment of the writ proceeding (see generally 9 Witkin, Cal.Procedure, (3d ed. 1985) Appeal, § 505, p. 491; Cal. Civil Appellate Practice (Cont.Ed.Bar 1985) § 10.15, pp. 287-288), they contend that once the Court of Appeal ordered dismissal it lacked jurisdiction to reinstate the proceeding. Past cases have held, however, that under appropriate circumstances a Court of Appeal may vacate an order of dismissal and reinstate an appeal (see, e.g., *Lundy* v. *Lakin* (1949) 89 Cal.App.2d 849 [202 P.2d 369]; *Krug* v. *Meehan* (1951) 108 Cal.App.2d 416 [239 P.2d 46]; see generally 9 Witkin, Cal.Procedure, Appeal, *op. cit. supra,* at § 514, pp. 497-498), and at least under the circumstances of this case—in which the Court of Appeal, in ordering dismissal, was apparently unaware that the clerk of the court had failed to immediately notify the People of the proposed abandonment as required by rules 19(c) and 38—we conclude that the Court of Appeal had similar authority to vacate its dismissal of the writ proceeding. Indeed, in view of the fact that defendants voiced no objection to the Court of Appeal's reinstatement of the proceeding at a time when the People could still have sought review of the initial dismissal in this court, it clearly would be inequitable to permit defendants to challenge the Court of Appeal's decision on such a basis at this late date.

Accordingly, we turn to the merits of the Court of Appeal decision.

## III

The principal issue is whether the Court of Appeal properly declined to follow this court's recent decision in *McCovey*. Some background on the geography and history of the Hoopa Valley Indian Reservation may be a helpful preface to a summary of the *McCovey* decision.

---

promulgated the regulation had not demonstrated a sufficient justification to warrant that degree of interference with Indian fishing rights.

In *United States* v. *Eberhardt* (9th Cir. 1986) 789 F.2d 1354, the Ninth Circuit reversed the *Wilson* decision, holding that the district court had applied an improperly restrictive legal standard in concluding that the Interior Department had exceeded its statutory authority in issuing the fishing regulations for the Hoopa Valley Indian Reservation.

## A.

As explained in *McCovey,* the present Hoopa Valley Indian Reservation is, geographically, made up of three contiguous sections: "(1) the Old Klamath River Reservation, a 2-mile wide strip of land, 1 mile in width on each side of the Klamath River, which extends 20 miles inland from the mouth of the river on the Pacific Ocean; (2) the original Hoopa Valley Reservation, a 12-mile square area, containing approximately 89,000 acres, which lies on both sides of the Trinity River; and (3) a 30-mile strip along the Klamath River which connects (1) and (2)." (*McCovey, supra,* 36 Cal.3d at pp. 523-524.) (A map of the reservation is set forth as an appendix to *McCovey, supra,* 36 Cal.3d at p. 538.)

The history of the Hoopa Valley Indian Reservation has been recounted in detail in two United States Supreme Court, and numerous lower court, decisions over the past seventy-five years and there is no need to extensively review that history here. (See, e.g., *Donnelly* v. *United States* (1913) 228 U.S. 243 [57 L.Ed. 820, 33 S.Ct. 449]; *Mattz* v. *Arnett* (1973) 412 U.S. 481 [37 L.Ed.2d 92, 93 S.Ct. 2245]; *United States* v. *Eberhardt, supra,* 789 F.2d 1354; *Blake* v. *Arnett* (9th Cir. 1981) 663 F.2d 906; *Elser* v. *Gill Net Number One* (1966) 246 Cal.App.2d 30 [54 Cal.Rptr. 568]; *Arnett* v. *Five Gill Nets* (1975) 48 Cal.App.3d 454 [121 Cal.Rptr. 906]; *Donahue* v. *Justice Court* (1971) 15 Cal.App.3d 557 [93 Cal.Rptr. 310].) For our purposes, a brief summary should suffice.

In 1853, Congress enacted legislation authorizing the President "to make . . . reservations . . . in the State of California . . . for Indian purposes." (10 Stat. 238 (Mar. 3, 1853).) Two years later, the President established the Klamath River Reservation by executive order. (See *Mattz* v. *Arnett, supra,* 412 U.S. 481, 487 [37 L.Ed.2d 92, 96].) In 1864, Congress passed legislation authorizing the President to set apart no more than four tracts of land in California "for the purposes of Indian Reservations," and in 1876, the Hoopa Valley Indian Reservation—a reservation geographically separate from the Klamath River Reservation—was formally set aside for Indian purposes pursuant to the 1864 act. (*Id.* at pp. 493-494 [37 L.Ed.2d at pp. 99-101].)

In 1891, the original Hoopa Valley Indian Reservation "was extended [by executive order] so as to include all land, one mile in width on each side of the [Klamath] [R]iver, from 'the present limits' of the [original] Hoopa Valley Reservation to the Pacific Ocean. The Klamath River Reservation, or what had been the reservation, thus was made part of the Hoopa Valley Reservation, as extended." (*Mattz* v. *Arnett, supra,* 412 U.S. 481, 493 [37 L.Ed.2d 92, 100].)

In 1913, the question of the validity of the 1891 extension of the Hoopa Valley Reservation came before the United States Supreme Court in *Donnelly* v. *United States, supra,* 228 U.S. 243. In that case, the defendant had been tried and convicted in federal court for killing a member of the Yurok (or, as it was also known, Klamath) Indian tribe "while he was in or near the edge of the water of the Klamath River, at a place within the exterior limits of the Extension" (228 U.S. at p. 252 [57 L.Ed. at p. 824]), and the defendant contended, inter alia, that the federal government had no jurisdiction over the case because the executive order extending the Hoopa Valley Reservation to include the area of the Klamath River Reservation was invalid and thus the crime had not been committed within the boundaries of a federal Indian reservation. The *Donnelly* court rejected the contention and affirmed the conviction.

Despite the *Donnelly* decision, *supra,* 228 U.S. 243, over the ensuing decades questions continued to be raised as to whether the Hoopa Valley Reservation Extension—the old Klamath River Reservation—remained in existence or whether that portion of the reservation had been terminated by an 1892 federal act permitting allotment of unoccupied land in that area to non-Indian settlers. (See, e.g., *Elser* v. *Gill Net Number One, supra,* 246 Cal.App.2d 30, 34 [54 Cal.Rptr. 568].) In *Mattz* v. *Arnett, supra,* 412 U.S. 481, that question arose in the context of an action brought by the California Department of Fish and Game, seeking a court order authorizing the sale or destruction of five gill nets—belonging to Raymond Mattz, a Yurok Indian—which had been seized by a California game warden. In the initial state court proceeding, the California courts concluded that in light of the 1892 federal act the Klamath River Reservation was not Indian territory and that the gill nets were therefore subject to seizure pursuant to state law. (*Arnett* v. *Five Gill Nets* (1971) 20 Cal.App.3d 729 [97 Cal.Rptr. 894].) The United States Supreme Court granted certiorari and reversed, concluding "that the Klamath Indian Reservation was not terminated by the [1892 legislation] and that the land within the boundaries of the reservation is still Indian country. . . ." (*Mattz* v. *Arnett, supra,* 412 U.S. at p. 506 [37 L.Ed.2d at p. 107].)

In the proceedings on remand of the *Mattz* v. *Arnett* decision, the trial court held that, in view of the United States Supreme Court's conclusion as to the status of the Hoopa Valley Reservation Extension, the state had no authority to regulate subsistence fishing by Indians on the Klamath River Reservation because federal law exempted Indian fishing rights on reservations from state regulation. The state appealed that ruling, but in *Arnett* v. *Five Gill Nets, supra,* 48 Cal.App.3d 454 [hereafter *Five Gill Nets*], the Court of Appeal affirmed the trial court's decision, rejecting the state's arguments (1) that federal law did not protect the Indians' traditional on-reservation

fishing rights from state regulation, and (2) that the state's interest in conservation of salmon was sufficient to justify the regulation at issue in that case. The United States Supreme Court denied the state's petition for certiorari. (*Arnett* v. *Five Gill Nets* (1976) 425 U.S. 907 [47 L.Ed.2d 757, 96 S.Ct. 1500].)

In 1977, two years after the *Five Gill Nets* decision, *supra,* 48 Cal.App.3d 454, had established that Indians exercising traditional fishing rights in the Klamath River were exempt from state regulation, the United States Department of the Interior—the federal agency charged with the duty of overseeing Indian affairs—promulgated extensive regulations governing Klamath River fishing by Indians of the Hoopa Valley Reservation. (42 Fed.Reg. 40904-40905 (Aug. 12, 1977).)[3] The purpose of the regulations, as set forth in the regulations themselves, "is to protect the fishery resources and to establish procedures for the exercise of the fishing rights of Indians of the Reservation until a Reservation-wide management mechanism is established with the capability to manage and regulate the Indian fisheries on the Reservation. The regulations are intended to promote reasonably equal access to the fishery resources of the Reservation by all Indians of the Reservation, and to assure adequate spawning escapement." (25 C.F.R. § 250.1(a) (1988).)

As we noted in *McCovey,* the federal regulations are quite detailed and comprehensive. They specify the types and sizes of nets that may be used, the locations where the nets may be placed, and the particular days and hours when gill nets may be utilized; they require fish caught on the reservation to be marked in a particular manner and limit the number of fish Indians may transport off the reservation without a special permit. To facilitate the enforcement of the regulations, all eligible Indians are required to obtain and possess a fisher's identification card before exercising any fishing rights on the reservation. The regulations also establish the applicable punishments that may be imposed for violation of the regulations and establish procedures for the prosecution of such violations.

In addition, the regulations authorize local federal officials to promulgate in-season and emergency regulations when necessary to ensure the proper management of the reservation fisheries, to meet conservation needs and to protect spawning escapement. In order to promote conservation, for much of the period between the initial promulgation of the regulations in 1977 and the present, the federal regulations completely prohibited commercial fishing by Indians in reservation waters.

---

[3] The current regulations are contained in sections 250.1 to 250.23 of the Code of Federal Regulations.

## B.

Like the present case, *McCovey, supra,* 36 Cal.3d 517, was a state criminal prosecution brought against a Yurok Indian for commercial fishing activities committed while the federal regulations were in effect. The People argued in *McCovey* that because the federal regulations in force at the time of the charged offense themselves prohibited commercial on-reservation fishing by reservation Indians, the state criminal prosecution was compatible with, and not preempted by, federal law.

In *McCovey,* we reviewed at some length the numerous federal authorities which had considered the question of when a state could permissibly apply its own law to an Indian reservation or to tribal members. ■ We explained that the federal cases had recognized "two independent but related barriers to the assertion of state regulatory authority over tribal reservations and members. [Citation.] First, state authority may be preempted by federal law. Second, it may interfere with ' "the right of reservation Indians to make their own laws and be ruled by them." ' " (*McCovey, supra,* 36 Cal.3d at p. 525 [quoting *White Mountain Apache Tribe* v. *Bracker* (1980) 448 U.S. 136, 142-143 (65 L.Ed.2d 665, 672, 100 S.Ct. 2578)].) Furthermore, we noted that the governing federal decisions had established that the preemption doctrine was to be applied with somewhat more vigor in cases involving Indian affairs than in other areas, and had explained that " '[a]lthough a State will certainly be without jurisdiction if its authority is preempted under familiar principles of preemption, . . . prior cases [do] not limit preemption of State laws affecting Indian tribes to only those circumstances.' " (36 Cal.3d at p. 525 [quoting *New Mexico* v. *Mescalero Apache Tribe* (1983) 462 U.S. 324, 333-334 (76 L.Ed.2d 611, 620, 103 S.Ct. 2378)].) We also pointed out that in those circumstances in which there is a "pervasive" or "comprehensive" federal regulatory scheme governing a particular aspect of Indian affairs, the controlling federal cases made it clear that "state laws are preempted if they appear to 'disturb and disarrange' that scheme." (36 Cal.3d at p. 526 [quoting *Warren Trading Post* v. *Tax Comm'n.* (1965) 380 U.S. 685, 690-691 (14 L.Ed.2d 165, 168, 85 S.Ct. 1242)].)

For guidance in the application of these principles, the *McCovey* court turned to the then-recent United States Supreme Court decision in *New Mexico* v. *Mescalero Apache Tribe, supra,* 462 U.S. 324, which had addressed a preemption question in a setting somewhat similar to *McCovey.* In *Mescalero,* the Mescalero Apache Tribe, with extensive federal assistance and supervision, had established a comprehensive scheme for the management of the fish and wildlife resources on its New Mexico reservation, including the regulation of on-reservation hunting and fishing by both mem-

bers *and nonmembers* of the Mescalero tribe. In that case, New Mexico conceded that it had no jurisdiction to regulate the on-reservation hunting or fishing activities of tribe members, but contended that it could apply generally applicable state hunting and fishing laws to nonmembers who hunted or fished on the reservation, even when such state laws differed in some respects from the hunting and fishing regulations which had been adopted by the tribe. The United States Supreme Court unanimously rejected New Mexico's contention, concluding, inter alia, that application of state law even to non-Indians "would effectively nullify the Tribe's authority to control hunting and fishing on the reservation" and "would completely 'disturb and disarrange' . . . the comprehensive scheme of federal and tribal management established pursuant to federal law." (462 U.S. at p. 338 [76 L.Ed.2d at p. 623].)

After reviewing the comprehensive nature of the federal regulatory scheme governing Indian fishing on the Hoopa Valley Reservation, we concluded in *McCovey* that, as in *Mescalero*, "[t]here is little question that the exercise of state criminal jurisdiction in this area will 'disturb and disarrange' the federal scheme. [Citation.] Concurrent jurisdiction by the state would supplant the present federal regulatory scheme with an inconsistent dual system." (36 Cal.3d at p. 531.)

As we explained: "The federal regulations permit gill nets to be used to a limited extent, while California completely prohibits their use in the taking of salmon, steelhead or striped bass. [Citations.] The penalties for appellants' conduct in this case are more severe under California law. The maximum fine for a violation of section 8685.6 is $10,000, while the maximum fine under the federal regulations is $500. [Citations.] Violations of the federal regulations are adjudicated in reservation courts before Indian judges and juries, while violations under the Fish and Game Code are adjudicated in non-Indian courts. [¶] Moreover, state jurisdiction over Indian offenses involving fish caught on the reservation would 'effectively nullify' the express purpose of the federal regulations. [Citation.] With the state asserting its authority in the area, there would be no incentive for the Hoopa Valley Reservation Indians ever to establish a reservation-wide system capable of managing and regulating the resources of the reservation. If the tribe did establish a system, its authority to regulate would have but a 'hollow ring' and the exercise of that authority would be 'only at the sufferance of the State.' [Citation.] Thus, state jurisdiction would thwart Congress' overriding commitment to the encouragement of tribal self-government and economic development." (36 Cal.3d at p. 531.)

Finally, the *McCovey* court turned to the state's claim that its interest in conservation of the scarce salmon resources in the Klamath River nonethe-

less justified the exercise of state jurisdiction. With respect to this contention, the court noted that while in a *nonpreemption* context the United States Supreme Court, in the *Puyallup* trilogy,[4] had held that a state may, in the interest of conservation, regulate Indian fishing rights which were created by treaty, the Supreme Court had never held that concurrent state regulation for conservation purposes is permissible when there is a comprehensive federal regulatory scheme in place which is intended to serve a similar conservation interest and with which the state regulation conflicts. In this context, the *McCovey* court concluded that "[t]he state's interest in conservation of salmon is adequately protected by the federal regulations. An elaborate federal scheme regulates both on-reservation fishing and off-reservation sales. This factor—entirely absent in the *Puyallup* cases—is itself sufficient to preclude state intervention. Moreover, the existence of accompanying mechanisms for enforcement should adequately dispel the concern that exclusive federal jurisdiction will impact adversely on state resources." (36 Cal.3d at p. 533.)

As a consequence, the *McCovey* decision squarely held that the state was preempted from exercising jurisdiction over Indian fishing activities encompassed by the federal regulations.

## IV

As the Court of Appeal recognized, on its face the *McCovey* decision appears to be on all fours with the instant matter. Defendants, like McCovey, are Yurok Indians charged with violating state fish and game laws on the basis of on-reservation fishing activities which were governed by an applicable comprehensive federal regulatory scheme. Nonetheless, the Court of Appeal determined that *McCovey* was not controlling in the present case. The Court of Appeal relied on two grounds to support its conclusion, but, as we explain, neither ground withstands scrutiny.

### A.

■ First, the Court of Appeal suggested that a legal notice published in July 1985 by the local area director of the Bureau of Indian Affairs, indicating that the salmon population in the Klamath River continued to decline after our decision in *McCovey*,[5] demonstrated that the state's interest in

---

[4] See *Puyallup Tribe v. Dept. of Game* (1968) 391 U.S. 392 [20 L.Ed.2d 689, 88 S.Ct. 1725] (*Puyallup I*); *Washington Game Dept. v. Puyallup Tribe* (1973) 414 U.S. 44 [38 L.Ed.2d 254, 94 S.Ct. 330] (*Puyallup II*); *Puyallup Tribe v. Washington Game Dept.* (1977) 433 U.S. 165 [53 L.Ed.2d 667, 97 S.Ct. 2616] (*Puyallup III*).

[5] The notice in question, entitled "In-Season Regulation Change Indian Fishing Hoopa Valley Indian Reservation," stated in relevant part: "Under the regulations of the Interior

conserving a threatened natural resource had become sufficiently compelling to justify concurrent state jurisdiction over Indian fishing in the Klamath River.

To begin with, however, even if a change in circumstances subsequent to *McCovey* might justify the state's institution of emergency measures to protect a threatened resource from imminent extinction, such a rationale could not be applied to sustain the criminal charges at issue in this case, which are based on conduct which occurred in 1981, three years prior to the *McCovey* decision. A change of circumstances *after McCovey* obviously could not alter the preemptive effect of the federal regulations in a case which arose well *before McCovey*.

Furthermore, in light of our analysis in *McCovey,* it is clear that a mere change of circumstances—such as the continuing decline in the salmon runs in the Klamath River—would not in itself be sufficient to alter that decision's preemption determination, particularly in the absence of a showing that the federal government or tribal authorities were failing to take conservation measures to protect the endangered resource. Here, the Bureau of Indian Affairs document to which the Court of Appeal referred itself demonstrates that the federal authorities had in fact taken substantial action in response to the increased risk to Klamath River salmon, and were by no means defaulting in their conservation tasks. (See fn. 5, *ante*.)[6] Under these

Department governing Indian fishing on the Hoopa Valley Indian Reservation, the Area Director of the Bureau of Indian Affairs is authorized to make in-season and emergency changes to the regulations when necessary to ensure proper management of the fisheries of the Klamath and Trinity Rivers. [¶] . . . The Bureau of Indian Affairs finds that the anadromous fish resources of the Klamath River Basin are in greater jeopardy in 1985 than they were in 1979. Chinook stocks have declined . . . The run size has reached a point where the spawning population on some tributary streams in the Klamath Basin may be in danger of being eliminated. Any further reductions in run size also make the resource increasingly vulnerable to the adverse impacts of natural phenomena such as drought, flood or high ocean temperature . . . [¶] The precarious state of the resource has caused the United States Commerce Department and the states of California and Oregon to ban the commercial harvest of salmon in those waters that have high concentrations of Klamath origin chinook. The Bureau of Indian Affairs has already responded to this crisis by imposing closures on the Indian fishery designed to significantly enhance the escapement of salmon to the spawning area. [¶] The Bureau of Indian Affairs has concluded that these closures will produce the required harvest reductions to preserve the resource and allow limited fishing for ceremonial and subsistence purposes. There is a significant risk that these closures will not result in the necessary harvest reductions if fishing pressure is increased by persons intending to sell all or part of their catch. . . . [¶] The Interior Department recently issued a draft environmental impact statement which proposed to permit the exercise of Indian commercial fishing rights pursuant to a fishery management plan when the expected run size exceeds subsistence, ceremonial and spawning needs. Those conditions do not exist for the 1985 season. [¶] Based on the foregoing considerations, commercial fishing on the Hoopa Valley Indian Reservation and the sale of fish caught on that reservation is prohibited."

[6]The parties have presented a number of reports, prepared by federal and state agencies which monitor fishing runs in the Klamath River, which indicate that the size of the salmon

circumstances, we conclude that there was no justification for the Court of Appeal's determination that *McCovey*'s holding was no longer controlling.[7]

### B.

■ The Court of Appeal alternatively suggested that because the *McCovey* decision did not explicitly advert to the fact that a majority of Klamath River salmon are hatched outside the Hoopa Valley Reservation, in state fish hatcheries or other nonreservation spawning grounds, "[o]ne may read [the *McCovey*] holding as limited solely to those fish resources which spawn in reservation waters or which were stocked by [Department of] Interior fisheries." The Court of Appeal was apparently of the opinion that *McCovey*'s preemption analysis was applicable only to "an exclusive reservation resource" and did not apply to fish which originated outside of the reservation.

To begin with, we believe it is clear from the *McCovey* decision that the *McCovey* court was well aware that a substantial portion of Klamath River salmon spawn outside reservation waters. (See *McCovey, supra,* 36 Cal.3d at p. 524, fn. 7.) Furthermore, the Court of Appeal cited no authority which suggests that Indian fishing rights in reservation waters extend only to fish which are hatched within the boundaries of the reservation, and we know of no decision which supports such a proposition. (Cf. *United States* v. *State of Washington* (9th Cir. 1985) 759 F.2d 1353, 1358-1360, cert. den. 474 U.S. 994 [88 L.Ed.2d 358, 106 S.Ct. 407] [state hatchery fish are subject to allocation under Indian treaties].) In any event, the state provisions at issue in this case do not purport to draw any distinction between fish which hatch outside reservation waters and those which hatch within the reservation but rather extend their broad prohibitions to all fish. Even if a state could

---

runs in the river has increased significantly since July 1985. The improvement has apparently resulted, at least in substantial part, from the cooperative efforts of numerous federal and state agencies which have jurisdiction over various aspects of both ocean and in-river salmon fishing. (See 16 U.S.C. § 460ss et seq., added by Pub.L. No. 99-552 (Oct. 27, 1986) 100 Stat. 3080 [establishing Klamath Fishery Management Council]; Fish & G. Code, § 16500 et seq., added by Stats. 1986, ch. 1186, § 1 [No. 6 Deering's Adv. Legis. Service, pp. 509-511] [authorizing state representative to negotiate and approve agreement authorizing commercial fishing by Indians in Klamath River under specified circumstances].)

[7] In his concurring opinion, Justice Kaufman suggests that under *McCovey* and the relevant federal authorities, the state retains the right to adopt new provisions applicable to Indian fishing on the reservation if the provisions are narrowly tailored to meet an exigency threatening an endangered species and if the state can adduce sufficient facts to show that such a regulation serves a compelling interest which the federal regulations do not address or fail to safeguard. (See *post,* p. 375.) Because no such newly adopted, narrowly tailored state regulation is involved in this case, we have no occasion to decide whether such a state provision could properly coexist with the applicable federal regulations (cf. *Metlakatla Indians* v. *Egan* (1962) 369 U.S. 45 [7 L.Ed.2d 562, 82 S.Ct. 552]) and we express no opinion on that matter.

properly establish a special interest in the regulation of a state-created resource, it would clearly be incompatible with the independent nature of Indian fishing rights to suggest that a state may obtain broad authority to prohibit all on-reservation gill-net or commercial fishing by reservation Indians whenever it establishes hatcheries outside a reservation and permits fish from such hatcheries to pass through reservation waters.

Thus, we conclude that the fact that many Klamath River salmon hatch outside the boundaries of the Hoopa Valley Reservation, has no effect on our holding in *McCovey* that the applicable federal regulations—which draw no distinction between reservation- and nonreservation-bred salmon—preempt the state from applying the relevant state fish and game laws to on-reservation fishing activities by reservation Indians.

Accordingly, neither of the rationales on which the Court of Appeal relied justifies a departure from the *McCovey* ruling.

## V

The People alternatively suggest that the result reached by the Court of Appeal should be sustained on an entirely different, and much more radical and far-reaching, theory. The People maintain (1) that, notwithstanding *McCovey* and numerous other state and federal decisions, the Indians of the Hoopa Valley Reservation in fact do not possess *any* federally reserved fishing rights in the Klamath River at all, and (2) that the federal government lacked the constitutional authority to establish the regulations over Hoopa Valley Reservation fishing which this court found preemptive in *McCovey.* The People argue that when California was admitted to statehood in 1850 the Klamath River was a navigable body of water whose title passed from the federal government to the state (see, e.g., *Pollard's Lessee* v. *Hagan* (1845) 44 U.S. (3 How.) 212 [11 L.Ed. 565]; *Shively* v. *Bowlby* (1894) 152 U.S. 1 [38 L.Ed. 331, 14 S.Ct. 548]), and thus in 1891 the federal government had no interest in the Klamath River or its fish resources that it could properly pass to the Indians through the creation of the reservation. The People assert that the federal authorities recognized this state of affairs in 1891 and that the 1891 federal executive order which extended the original Hoopa Valley Reservation to include the old Klamath River Reservation actually excluded the Klamath River from the reservation. According to the People's argument, California retains sole jurisdiction over the Klamath River and its fish resources and thus may regulate Indian fishing in the Klamath River free from any federal restraints.

To support the argument, the People request the court to take judicial notice of a number of historical documents which they assert support their

interpretation of the 1891 executive order.[8] Defendants vigorously oppose the request, suggesting that many of the purportedly factual statements in the documents are actually subject to dispute and additionally maintaining that the documents should have been presented at the preliminary hearing. We need not decide whether defendants' objections to judicial notice are well taken because we conclude that, in any event, the legal theory on which the People rely is untenable for a number of reasons.

To begin with, the People's broad claim that Yurok Indians enjoy no federally protected fishing rights in the Klamath River flies directly in the face of *all* of the recent federal and state decisions involving Yurok Indian fishing on the Hoopa Valley Reservation. As we have seen, in 1975 the California Court of Appeal specifically held in *Five Gill Nets, supra,* 48 Cal.App.3d 454, certiorari denied (1976) 425 U.S. 907 [47 L.Ed.2d 757, 96 S.Ct. 1500], that state regulation of such on-reservation Indian fishing was preempted by the Indians' federally protected fishing rights; that holding, of course, is totally incompatible with the People's present contention that the Yurok Indians enjoy *no* federally protected fishing rights in the Klamath River. Similarly, more recent federal decisions have likewise expressly recognized that "[t]he right to take fish from the Klamath River was reserved to the Indians when the reservation was created." (*United States* v. *Eberhardt, supra,* 789 F.2d 1354, 1359; see *Blake* v. *Arnett, supra,* 663 F.2d 906, 909; *Pacific Coast Fed.* v. *Secretary of Commerce* (N.D.Cal. 1980) 494 F.Supp. 626, 632-633.) And, of course, our *McCovey* decision also expressly held that the Yurok Indians possess federally reserved fishing rights in the Klamath River which are properly subject to federal regulation. (*McCovey, supra,* 36 Cal.3d at p. 534.)

Although the People acknowledge that their current contention is inconsistent with the opinions in each of these cases, they argue that because none of the prior decisions expressly considered the particular historical evidence or legal theory on which they now rely, those decisions should not be considered controlling authority. The reach of those decisions, however, may not be so readily circumvented. The issue of the existence of federally reserved Indian fishing rights was directly in question in each of these cases, and the State of California was in fact a principal litigant in several of the proceedings. The People had ample opportunity in the prior litigation to

---

[8] The historical documents include (1) an 1889 opinion of the United States Attorney General (S. Exec. Doc. No. 140, 50th Cong., 2d Sess. (1889) printed in 4 Sen. Exec. Docs., 50th Cong., 2d Sess. and Special Sess. (Mar. 4, 1889), Nos. 131-147); (2) a letter, dated January 20, 1891, from the Office of the Assistant Attorney General for the Department of the Interior to the Secretary of the Interior; (3) a letter, dated October 12, 1891, from the Secretary of the Interior to the President of the United States; and (4) a 1940 opinion of the Solicitor of the Department of the Interior (1 Opns. Solic., Dept. of Inter. Rel. to Indian Affairs (1917-1974) pp. 945-948.)

challenge the validity of Indian fishing rights in the Klamath River on the theory they now urge. Having failed to successfully pursue such a legal argument in those cases, they may not avoid the holdings of those decisions at this juncture by resort to ostensibly newly discovered historic evidence or a new legal theory. (See, e.g., *Price* v. *Sixth District Agricultural Assn.* (1927) 201 Cal. 502, 511 [258 P. 387] ["an issue may not be thus split into pieces. If it has been determined in a former action, it is binding notwithstanding the parties litigant may have omitted to urge for or against it matters which, if urged, would have produced an opposite result."].) This is particularly true in a situation, like the present one, where many individuals have relied on the past decisions over a number of years and where a comprehensive federal regulatory scheme—adopted in the wake of the earlier decisions—has been in place for more than a decade. (Cf. *Arizona* v. *California* (1963) 373 U.S. 546, 598 [10 L.Ed.2d 542, 576-577, 83 S.Ct. 1468].)

Furthermore, the People's argument is not only defeated by the past judicial decisions but fails on its substantive merits as well. The People's fundamental assertion—that, after California's entry into the union, the federal government lost any right to reserve Indian fishing rights in the Klamath River through the establishment of an Indian reservation on federally owned land adjacent to the river—is quite similar to a claim which the United States Supreme Court expressly rejected 25 years ago in the case of *Arizona* v. *California, supra,* 373 U.S. 546. In that case, the State of Arizona challenged the right of the federal government to reserve water rights for Indians in the Colorado River through the creation of new Indian reservations in Arizona after Arizona had become a state. In rejecting the claim, the court explained: "Arizona's contention that the Federal Government had no power, after Arizona became a State, to reserve waters for the use and benefit of federally reserved lands rests largely upon statements in *Pollard's Lessee* v. *Hagan,* . . . and *Shively* v. *Bowlby.* . . . Those cases and others that followed them gave rise to the doctrine that lands underlying navigable waters within territory acquired by the Government are held in trust for future States and that title to such lands is automatically vested in the States upon admission to the Union. *But those cases involved only the shores of and lands beneath navigable waters. They do not determine the problem before us and cannot be accepted as limiting the broad powers of the United States to regulate navigable waters under the Commerce Clause and to regulate government lands under Art. IV, § 3, of the Constitution. We have no doubt about the power of the United States under these clauses to reserve water rights for its reservations and its property.*" (373 U.S. at pp. 597-598 [10 L.Ed.2d at p. 576] [italics added, fn. omitted]; see also *United States* v. *New Mexico* (1978) 438 U.S. 696, 698 [57 L.Ed.2d 1052, 1055-1056, 98 S.Ct. 3012].) Although the reserved rights in *Arizona* v. *California* involved

the Indians' use of water for irrigation purposes, the People have cited no authority which suggests that Indian fishing rights, which may be equally central to Indian survival and self-sufficiency, are any less eligible for federal reservation and protection. (See *Blake* v. *Arnett, supra,* 663 F.2d 906, 909 ["at the time when the Reservation was first created," the fishing rights of Yurok Indians " 'were not much less necessary to the existence of the Indians than the atmosphere they breathed' "]. See generally *United States* v. *Winans* (1905) 198 U.S. 371, 381-382 [49 L.Ed. 1089, 1092-1093, 25 S.Ct. 662]; *Menominee Tribe* v. *United States* (1968) 391 U.S. 404, 406 [20 L.Ed.2d 697, 699, 88 S.Ct. 1705]; Cohen, Handbook of Federal Indian Law (1982 ed.) ch. 8, § B2, pp. 449-450.)

The People additionally argue that even if the federal government had the power to reserve Indian fishing rights in the Klamath River when it extended the Hoopa Valley Reservation in 1891, the contemporaneous historical documents of which they urge the court to take judical notice demonstrate that there was in fact no intent to reserve such rights. The documents in question, however, go no further than to indicate that the state, upon entry into the union, acquired title to the river bed of the Klamath River and its resources; they do not state, nor imply, that the federal government, in extending the Hoopa Valley Indian Reservation to include the old Klamath River Reservation, did not intend to protect the Indians' traditional fishing rights in the river. Indeed, as a number of judicial decisions have recognized, the Indians' fishing activities in the Klamath River were in fact central to the 1891 extension of the reservation.

Three quarters of a century ago, the United States Supreme Court, in *Donnelly* v. *United States, supra,* 228 U.S. 243—the initial decision analyzing the 1891 extension of the original Hoopa Valley Reservation to include the old Klamath River Reservation—emphasized the primary role that the river and Indian fishing activities played in the decision to establish the current boundaries of the reservation. As the court observed: "[I]n view of all the circumstances, it would be absurd to treat the [1891 executive] order as intended to include the uplands to the width of one mile on each side of the river, and at the same time to exclude the river. . . . *The reports of the local Indian agents and superintendents to the Commissioners of Indian Affairs abound in references to fishing as their principal subsistence,* and the river is described as running in a narrow canyon through a broken country, the Indians as dwelling in small villages close to its banks. [Citations.]" (Italics added.) (228 U.S. at p. 259 [57 L.Ed. at p. 827].)[9] In short, the

---

[9] In the initial opinion issued in *Donnelly,* the Supreme Court concluded both that the river was included in the reservation and that the then-applicable California statutes established that, for purposes of California law, the Klamath River was considered a nonnavigable stream. (228 U.S. at pp. 259-264 [57 L.Ed. at pp. 827-829].) On petition for rehearing, the de-

reason the extension of the Hoopa Valley Reservation took the form that it did was in recognition of the Yurok Indians' historic reliance on the fish resources of the Klamath River. (See also *Mattz v. Arnett, supra,* 412 U.S. 481, 487 [37 L.Ed.2d 92, 96-97]; *Arnett v. Five Gill Nets, supra,* 48 Cal.App.3d 454, 461; *Pacific Coast Fed. v. Secretary of Commerce, supra,* 494 F.Supp. 626, 633.) Thus, we reject the People's contention that the United States lacked either the power or the intent to protect the Yurok Indians' historic fishing rights in the Klamath River when it extended the Hoopa Valley Indian Reservation in 1891.

## VI

The judgment of the Court of Appeal is reversed and the proceeding is remanded to that court with directions to issue a peremptory writ of prohibition restraining further prosecution of the underlying criminal charges.

Lucas, C. J., Broussard, J., and Eagleson, J., concurred.

**KAUFMAN, J.**—I concur in the judgment, but write separately out of a concern that the majority opinion may be read as holding that the State of California is forever and in all circumstances barred from acting to preserve a scarce natural resource located on Indian lands within the state. As explained below, I do not read either *People v. McCovey* (1984) 36 Cal.3d 517 [205 Cal.Rptr. 643, 685 P.2d 687] or the pertinent federal authorities as so holding, nor, in my view, does our decision today preclude the exercise of concurrent state jurisdiction over tribal activities on Indian lands where the state's interest is sufficiently compelling. Both the United States Supreme Court and the Ninth Circuit Court of Appeals have held that the preservation of a scarce, common resource may constitute such an interest. (*New Mexico v. Mescalero Apache Tribe* (1983) 462 U.S. 324, 342 [76 L.Ed.2d 611, 625-626, 103 S.Ct. 2378]; *Puyallup Tribe v. Washington Game Dept.* (1977) 433 U.S. 165, 173-177 [53 L.Ed.2d 667, 674-677, 97 S.Ct. 2616]; *United States v. State of Or.* (9th Cir. 1983) 718 F.2d 299, 304-305; see also *People v. McCovey, supra,* 36 Cal.3d at p. 532, fn. 18.) When federal law is silent or unavailing, state law must be adequate to preserve the survival of endangered fish and wildlife resources.

---

fendant took issue with the court's interpretation of the California statutes relating to navigability, and the court—noting that the navigability question had not been pursued at trial—withdrew that portion of its initial opinion relating to the California statutes on navigability. (228 U.S. at pp. 708-712 [57 L.Ed. at pp. 1035-1038].) The court nonetheless upheld the defendant's conviction, reaffirming the conclusion that the trial court had properly found that the crime, which had been committed either on the river or its banks, was committed within the reservation and fell within the jurisdiction of the federal statute.

## A. *Prosecution Is Barred in This Case*

As noted above, I concur in the majority's conclusion that our holding in *McCovey* bars the prosecution of defendants in this matter. The alleged violations of Fish and Game Code sections 8434 and 8685.6 occurred in 1981, three years prior to our holding in *McCovey* that federal regulations preempt the state's fishery conservation laws as applied to the Hoopa Valley Indian Reservation. Thus, *McCovey* is clearly dispositive of this matter. Even if one were to accept the Court of Appeal's novel theory that changes in the escapement levels of Klamath River salmon could somehow resurrect sections 8434 and 8685.6 from the dustbin of preemption, the prosecution in this case would not be valid, as the violations occurred prior to the alleged change of circumstances.

Moreover, the broader ramifications of the Court of Appeal's theory are simply unacceptable. When escapement levels of salmon are high, the theory suggests, *McCovey* governs; when low, *McCovey* may be ignored. The Court of Appeal would thus reduce our holding to little more than a chimera, subject to the whim of the prosecutor and the fortunes of the anadromous fish. Clearly, this approach must be rejected.

Equally unacceptable, however, is the notion—vigorously condemned by Justice Mosk in his dissenting opinion—that "the State of California is necessarily and for all time barred from conserving a natural resource located within its borders." (Dis. opn. of Mosk, J. at p. 378.) Our decision in *McCovey,* it should be emphasized, does not stand for the proposition that federal "conservation" regulations preempt this state's environmental protection laws under any and all circumstances. While a full exploration of *McCovey's* impact on cases unrelated to the Hoopa Valley Indian Reservation must necessarily await another day, it is clear, in my view, that even "pervasive" federal regulatory schemes leave room for state laws directed explicitly to the preservation of an endangered species and supported by a sufficiently compelling factual record.

In the unusual case, such as that presented here, where we previously held that existing federal regulations "adequately protected" the state's interest (*People* v. *McCovey, supra,* 36 Cal.3d at p. 533), but subsequent events occur which suggest otherwise, a valid assertion of state regulatory authority would require (1) that the state adopt *new* provisions narrowly tailored to meet the exigency, and (2) adduce sufficient facts to show that the state law serves a compelling interest which the federal regulations do not address or fail to safeguard. Although the state in this matter failed to meet these criteria, as explained below, I believe that both state and federal decisions allow such an exercise of state authority.

B. *Federal Preemption of State Environmental Laws*

So far as I am aware, no court has ever decided that a state lacks the power to regulate tribal fishing on an Indian reservation in the express interest of preserving an endangered anadromous fish population. *Mattz* v. *Arnett* (1973) 412 U.S. 481 [37 L.Ed.2d 92, 93 S.Ct. 2245] held merely that the Klamath River Reservation had not been extinguished, but expressed no view as to the state's authority to regulate fishing on the reservation. (*Id.* at p. 485 [37 L.Ed.2d at p. 95].) On remand in *Arnett* v. *Five Gill Nets* (1975) 48 Cal.App.3d 454 [121 Cal.Rptr. 906], the Court of Appeal did not reach the issue because it found that state intervention "in the interest of preserving the fish" was not supported by the record. (*Id.* at pp. 463-464.) Similarly, our decision in *McCovey* was based, in part, on the fact that the state had not shown the exercise of its police power was necessary to preserve a scarce, common resource. (36 Cal.3d at pp. 532-533.) Our holding today, in my view, stands only for the limited proposition that state intervention may not be premised upon laws previously held to be preempted.

What these and other decisions do establish, however, is the principle that state jurisdiction over fish and wildlife resources located on federally regulated Indian reservations depends, in part, upon the nature of the state interests asserted. Though it is admittedly the rare case, the United States Supreme Court has nevertheless expressly recognized "that in exceptional circumstances a State may assert jurisdiction over the on-reservation activities of tribal members." (*New Mexico* v. *Mescalero Apache Tribe, supra,* 462 U.S. at pp. 331-332 [76 L.Ed.2d at pp. 618-619].) In so stating, it is significant that the high court referred expressly to *Puyallup Tribe* v. *Washington Game Dept., supra,* 433 U.S. 165, the third in a trilogy of cases dealing with the State of Washington's authority to regulate on-reservation fishing by members of the Puyallup tribe. Though not a preemption matter, the United States Supreme Court's recognition of the State of Washington's "power to conserve an important natural resource" is significant. (*Id.* at p. 175 [53 L.Ed.2d at p. 676].) Coupled with Justice Douglas's typically pungent observation in *Puyallup II* (*Washington Game Dept.* v. *Puyallup Tribe* (1973) 414 U.S. 44 [38 L.Ed.2d 254, 94 S.Ct. 330]) that the State of Washington's "police power . . . is adequate to prevent the steelhead [trout] from following the fate of the passenger pigeon" (*id.* at p.49 [38 L.Ed.2d at p. 258]), it suggests that a state's jurisdiction to preserve an endangered species survives the enactment of a federal regulatory scheme— even one which includes "conservation" among its stated goals.

Preemption of California environmental protection laws does not automatically follow from a finding that federal regulations applicable to Indian lands appear to address "similar" concerns. (Maj. opn., *ante,* at p. 367.) The

instant matter presents a classic case in point. The fishing regulations promulgated by the Bureau of Indian Affairs for the Hoopa Valley Indian Reservation state several goals: the protection of the reservation's fishery resources, the ensurance of equal access to the fishery resources by all eligible Indians, the preservation of fishing for traditional subsistence and ceremonial purposes as well as the promotion of economic self-sufficiency through commercial fishing. (25 C.F.R. §§ 250.1, 250.9.) The federal regulations permit the limited use of gill nets for these purposes. (25 C.F.R. § 250.9.)

*McCovey* found—on the facts presented—that the foregoing federal scheme "adequately protected" the "state's interest in the conservation of salmon." (36 Cal.3d at p. 533.) As we explained: "[T]he state has not shown that its interest in conservation is sufficient to justify assertion of concurrent authority. Thus, the state is preempted from exercising jurisdiction over appellant McCovey." (*Ibid.*)

*McCovey,* however, did not consider the validity of state intervention pursuant to a state statute or regulation enacted for the express preservationist or "environmentalist" purpose of preserving an endangered species from imminent extinction. I do not mean to suggest that this is the only circumstance in which state intervention would be proper. I do suggest, however, that an environmentalist measure of this nature differs in kind from the typical "conservationist" regulations enacted by the Bureau of Indian Affairs under the aegis of the Department of the Interior. The objective of the federal government in this, as in many other cases, is sustained economic development on the reservation enlightened by rational management of its resources. This "scientific" approach to resource management lies at the heart of the "conservationist" ethic, an idea championed by the Progressives at the turn of the century and since institutionalized by resource management experts in various government agencies. (See Hays, Conservation and the Gospel of Efficiency: The Progressive Conservation Movement 1890-1920 (1959) pp. 1-4, 145-146.) "Environmentalism," on the other hand, is a movement of more recent origins, and generally has its goal the *preservation* of resources *from* development. (See Schrepfer, The Fight to Save the Redwoods: A History of Environmental Reform 1917-1978 (1983) pp. 16, 229-244; Weyeneth, *The Color Green: Politics in the Age of Ecology* (1988) 16 Reviews in American History 298, 303-305.)

I am not suggesting that the federal regulations at issue here contemplate the annihilation of the Klamath River salmon. On the contrary, as noted above, they appear to seek *sustained* economic development. I do suggest, however, that federal conservationist goals are not necessarily congruent with local environmental concerns. The federal regulations, it must be re-

membered, seek to create private rights on the reservation for purely personal financial gain. As the Court of Appeal noted, however, that small stretch of the Klamath River which passes through the reservation serves as a veritable "gateway" for salmon seeking freshwater spawning grounds hundreds of kilometers away from the reservation. Many of these salmon actually originated in state-operated hatcheries located off the reservation. What occurs on the reservation may dramatically affect fishery resources throughout the state. Thus, the state has a distinct and valid interest in the preservation of this common resource for all of its citizens.

Accordingly, the existence of a federal regulatory scheme that purportedly includes among its goals the "conservation" of reservation resources does not terminate the preemption analysis. Courts must continue to determine the respective federal, state and tribal interests, and where a sufficiently compelling environmental concern—such as the preservation of an endangered species—necessitates state enforcement, must be free to find concurrent state jurisdiction.

Panelli, J., concurred.

**MOSK, J.**—I dissent. The majority embrace the opinion of Chief Justice Bird for a unanimous court in *People* v. *McCovey* (1984) 36 Cal.3d 517 [205 Cal.Rptr. 643, 685 P.2d 687]. I agreed with that opinion and signed it.

However, I do not concede that the State of California is necessarily and for all time barred from conserving a natural resource within its borders. As was pointed out in *Donahue* v. *Justice Court* (1971) 15 Cal.App.3d 557, 564 [93 Cal.Rptr. 310]: "Congress may, of course, enact legislation limiting the right . . . to fish on the reservation. . . . Likewise the state is not precluded from exercising its general police power under factual situations reasonably requiring the exercise of such power." I believe the State of California has now demonstrated a factual situation justifying the use of its police power.

It is not necessary to recite the entire opinion of the Court of Appeal in this case, but I do adopt as my own the conclusion of Justice Haning, for himself and Presiding Justice Low and Justice King: We conclude that the state's concurrent jurisdiction over tribal salmon fishing in the Klamath River is not preempted by the federal regulations. We are of the view that *McCovey* does not directly apply to the case before us, for two reasons.

First, in the context of the conservation of a finite, threatened natural resource the state's regulatory ability is not static. The conservation of such a natural resource is sufficiently compelling to enable the state to assert a

more powerful need for conservation. The People have presented clear indications that after *McCovey* was decided the Klamath River population continued to decline. The Bureau of Indian Affairs found that the salmon population was in greater jeopardy in 1985 than in 1979 when the moratorium was first imposed. In fact, the bureau concluded—after *McCovey* was decided—that the spawning run was *"in danger of being eliminated."* *McCovey*, as well controlling precedent of the United States Supreme Court, does not preclude concurrent state jurisdiction over a precarious state resource. As the Ninth Circuit has recently ruled, a state may regulate Indian fishing if its regulation is reasonable and necessary for conservation. "Unlike Congress, states may not qualify Indian fishing rights. *Puyallup Tribe* v. *Department of Game (Puyallup I)*, 391 U.S. 392, 398, 88 S.Ct. 1725, 1728, 20 L.Ed.2d 689 (1968); [*United States* v.] *Sohappy*, 770 F.2d [816,] 823; [*United States* v.] *Fryberg*, 622 F.2d [1010], 1014-15. However, states may regulate Indian rights in the interest of conservation by an appropriate exercise of their police power. State regulation for conservation purposes is based on the state's interest in protecting fish and wildlife resources for the benefit of its citizens. *See Puyallup Tribe* v. *Department of Game (Puyallup III)*, 433 U.S. 165, 175-76, 97 S.Ct. 2616, 2622-23, 53 L.Ed.2d 667 (1977); *see also United States v. Michigan,* 653 F.2d 277, 279 (6th Cir.), *cert. denied,* 454 U.S. 1124, 102 S.Ct. 971, 71 L.Ed.2d 110 (1981). The violation of state conservation laws is a federal offense. 16 U.S.C. § 3372(a)(2) (1982); *see Sohappy,* 770 F.2d at 834-24. [¶] A state must show that any regulation of Indian fishing rights is both reasonable and necessary for conservation purposes. *Antoine* v. *Washington,* 420 U.S. 194, 207, 95 S.Ct. 944, 951, 43 L.Ed.2d 129 (1975); *Sohappy,* 770 F.2d at 823. State regulations meeting these standards may extend to the manner of fishing, the size of the take, and the restriction of commercial fishing. *Puyallup I,* 391 U.S. at 398, 88 S.Ct. at 1728. In the context of state regulation of Indian fishing rights, we have rejected the endangered species approach to conservation, finding that fishing limitations may be proper even though extinction is not imminent. *United States* v. *Oregon,* 718 F.2d 299, 305 (9th Cir. 1983)." (*United States* v. *Eberhardt* (9th Cir. 1986) 789 F.2d 1354, 1361-1362.) In light of the post-*McCovey* diminution of the salmon run to the point of imminent demise, we can easily distinguish the situation which now faces us from that [in *McCovey* in 1984].

Second, and perhaps of greater significance, *McCovey*, as well as *Arnett* [*Arnett* v. *Five Gill Nets* (1975) 48 Cal.App.3d 454 (121 Cal.Rptr. 906)] assumed the Klamath River salmon at issue therein were exclusively a reservation resource. One may read its holding as limited solely to those fish resources which spawn in reservation waters or which were stocked by Interior fisheries. In fact, however, the majority of Klamath River salmon runs are a state resource, which has been substantially enhanced over the

years by stocking efforts of the State Resources Agency at the Iron Gate Salmon and Steelhead Hatchery, located outside the Reservation boundary upstream from the reservation. (See, e.g., State of Cal. Resources Agency, Dept. of Fish & Game, Ann. Rep. Iron Gate Salmon & Steelhead Hatchery 1983-1984, Admin. Rep. No. 85-01 (1985), of which we take judicial notice.)

*McCovey* did not hold that California's salmon and steelhead stock, added to the upstream Klamath waters through state fish hatcheries or other nonreservation spawning grounds, is to be governed by the same considerations as an exclusive reservation resource such as the deer resource discussed in *Mescalero* [*New Mexico* v. *Mescalero Apache Tribe* (1983) 462 U.S. 324 (76 L.Ed.2d 611, 103 S.Ct. 2378)]. Neither *McCovey* nor *Arnett* held that the state could not protect its own fish from extinction. We therefore conclude that the anadromous fish traversing the Klamath River passage are not under the total dominion of the Yurok Tribe, and petitioners' gill netting may be regulated by the State of California in the interests of conservation, and the protection of its own fish.

Accordingly, the petition for writ of prohibition [should be] denied. [End of Court of Appeal opinion, parallel citations omitted, fn. omitted.]

The petition for a rehearing was denied October 13, 1988. Mosk, J., and Kaufman, J., were of the opinion that the petition should be granted.